ABRAM SANBORN, petitioner for the Penobscot County Bar,
*vs.*
BENJAMIN KIMBALL.

*Attorney—for what causes and how disbarred.*

An attorney at law is an officer of the court, and may be removed from office for misconduct, ascertained and determined by the court after an opportunity to be heard has been afforded.

The statute makes "a good moral character" a pre-requisite of admission to the bar and when an attorney at law has forfeited his claim to such character by such misconduct, professional or non-professional, in or out of court, as renders him unworthy to associate with gentlemen and unfit and unsafe to be entrusted with the powers, duties and responsibilities of the legal profession, the court may deprive him of the power and opportunity to do further injury under the color of his profession by removing him from the bar.

The evidence in this case conclusively establishes the allegation in the motion that "the respondent does not possess a good moral character," in that it shows that he has committed a fraud upon the court, violated his professional oath and duty, conducted dishonestly in his private dealings and disregarded the proprieties and civilities due to other members of the profession.

By admitting the respondent to the bar the court held him out to the public as worthy of confidence and patronage in the line of his profession. In view of the power of removal vested in the court, to allow the respondent to continue to exercise his profession after he has been thus proved to be unworthy of his office, would be indirectly to involve the court in the responsibility of his acts. And further, after the disclosures in this case, the court cannot forbear to pronounce the judgment of removal from office against the respondent without abdicating the high trust which the law confides to it in this behalf, and rendering that a nullity.

The respondent has been pardoned for the forgery of which he was convicted and for which he was confined in the state prison; but the instrument forged was a deposition used in a cause before this court; and though the pardon purged him of the offence of which he was convicted it did not affect the crime of the violation of his professional oath and duty, nor relieve him from the penalty of removal from the bar for this misconduct.

ON REPORT.

This was a motion presented by Hon. A. Sanborn in behalf of the bar of Penobscot county, for the removal of Benjamin Kimball from the office of an attorney and counsellor at law. It

prayed for a rule upon Mr. Kimball to show cause why he should not be removed, assigning as causes that he did not "possess a good moral character," in this that at the February term 1860, of this court for this county, he was convicted of forgery for which he was at the following criminal term sentenced to two years imprisonment at hard labor in the state prison; also, in that he had been guilty of repeated dishonest if not criminal acts, and on one occasion if not more, of obtaining money by false pretences; and in that he had been guilty of unprofessional conduct in wittingly promoting and suing false and groundless suits and otherwise violated his oath and the duties of his said office.

The motion was made and the rule to show cause granted at chambers in term time, but while the court was not actually in session, returnable to the court in session. At the return day of the rule the respondent moved that the complaint be dismissed or quashed and the rule discharged, because it did not appear by it that he was convicted of a forgery committed when acting as an attorney and counsellor of this court or in a matter in which he acted as such attorney, that it did not appear but that he had been restored to all his rights by an executive pardon, nor were the persons of whom he obtained money nor the dishonest acts so specified as to enable him to prepare any defence, nor was there any statement of instances of unprofessional conduct, neither was the complaint sworn to nor had the judge in chambers authority to take any action or make any order thereon, because the notice was defective and insufficient, requiring him to appear before some judge without designating whom, nor that it should be before the court in session and also because the court could only pass upon his moral character as affected by some act done by him in the capacity of an attorney and counsellor, and had nothing to do with his conduct as an individual or in other relations.

The court then appointed Joseph Carr, Esq., a commissioner to take the testimony relating to this matter, who entered upon and completed the discharge of this duty without taking any qualifying oath. For this reason the respondent objected to the

acceptance of Mr. Carr's report when it was offered; also, because
(as he said) a commissioner should only state the testimony and
had no right to find facts, or his conclusions from what he deemed
to be facts, because he received the proceedings of the Penobscot
bar (had before the motion or complaint presented in its behalf
was made or any rule served on the respondent) as a specification
of the charges upon which these proceedings were based and sent
them up to the court with his report, although the same had
never been authenticated by the secretary of the bar association,
because after the respondent had commenced to take his deposi
tions the complainants were allowed to take the deposition of
William P. Tenney, and because testimony was taken of the acts of
the respondent as an individual in no wise connected with his pro-
fessional conduct. Subsequently he filed a motion to strike out
all but the charges of a conviction of forgery and of wittingly pro-
moting groundless suits upon the ground that the other charges
were too indefinite to afford any basis of action, and afterwards
asked to have this last charge stricken out for the same reason.
The minutes of the meeting of the Penobscot bar annexed to the
commissioner's report and referred to in the respondent's motion,
set out the report of a committee previously appointed, made to
that meeting in which they reported substantially the conviction
of Mr. Kimball of forgery, his sentence and imprisonment, that
several years after his release (to wit, in 1873) he returned to
Bangor and resumed the practice of his profession there, that he
had in the several instances specified obtained money upon false
pretences and had unsuccessfully attempted to do so of various
persons mentioned, that he had instituted groundless suits; one
against the gentleman who had him arrested to compel repay-
ment of a loan fraudulently obtained, and another against Ezra C.
Brett, Esq., for writing to the governor a letter remonstrating
against the appointment of Mr. Kimball to be a justice of the
peace upon the ground of his unfitness. In the former of these
suits Mr. Kimball obtained a verdict for nominal damages upon
the technical ground that the writ upon which he was arrested

was in form a summons and attachment containing no order for an arrest, the attorney neglecting to strike out and insert the few words necessary to change it into a capias; the latter suit is still pending. The report also stated the instances of discourteous and improper language and conduct towards other members of the bar which are referred to in the opinion, where will be found a statement of the particular circumstances of his various fraudulent operations that were fully proved.

Mr. Kimball was married in 1853, in Sutton, N. H., and within the year following his wife left him and they never lived together afterwards. In 1859 he applied to this court for a divorce and to procure it produced what purported to be the deposition of Joseph Greeley of Sutton, taken before J. H. Allen, Esq., with a regular certificate of that magistrate attached, in which the deponent was represented as testifying that he saw the parties married, knew that Mrs. Kimball returned to New Hampshire in less than a year and had been there ever since and had told the witness that she should never return because Mr. Kimball was too literary for her, kept himself in his study, cared nothing for balls, &c., of which she was fond and that, though she had seen the published notice of his libel, she should not appear nor trouble him, but allow him to have his divorce. The deponent was also represented as answering that he had heard a rumor of her commission of adultery with a person named but knew of no improper relations between them. This deposition and caption were forged by Kimball. He presented and read them at the hearing upon his libel and obtained a decree of divorce. At the succeeding February term 1860, of this court he was indicted for the forgery, tried and convicted; and at the next criminal term in August 1860, was sentenced to two years imprisonment in the state prison. He was committed in execution of his sentence upon the twenty-second day of October 1860. He introduced in his defence to the present proceedings a certified copy of the petition of A. Sanborn and other members of the Penobscot bar, dated February 9, 1861 (probably it should be 1862), and petitions signed by about

four hundred citizens of Bangor, Veazie and vicinity, praying for his pardon upon the ground that he had been in the county jail thirteen months before being taken to Thomaston, and no party was actually injured by his forgery because his wife desired a divorce and had a libel pending in New Hampshire when he made his application and therefore "whatever of wrong attaches is, in effect, only technical." Upon these representations the executive council on the twenty-first day of February 1862 advised his pardon, and he was pardoned by Gov. Washburn on that day; the document reciting in the usual form, that "we do hereby grant unto him, the said Benjamin Kimball, a full and free pardon, and restore him to citizenship, of which all our judges, magistrates, officers, &c., are to take notice." This pardon Mr. Kimball now pleaded in bar of any attempt to remove him from his office of attorney on account of the conviction aforesaid. After his release from the state prison Mr. Kimball went to Philadelphia and did not return to Maine till 1873, when he re-opened an office in Bangor. The respondent moved and earnestly urged that the whole case with the voluminous testimony, papers, motions, &c., be reported to the full court for its determination thereon, which was assented to by the petitioners and it was reported accordingly, together with the findings of the commissioner.

*A. Sanborn* in behalf of the Penobscot county bar.

This court has power to disbar the respondent. *Ex parte Bradley,* 7 Wallace, 364; *Bradley* v. *Fisher,* 13 Wallace, 335.

His motions were properly overruled. *Randall,* petitioner, 11 Allen, 473; *In re Percy,* 36 N. Y., 651; *Randall* v. *Brigham,* 7 Wallace, 523.

No necessity for the commissioner to be sworn.

If the court has the power of removal argument is unnecessary to show that upon the facts presented, an occasion has arisen which demands its exercise. Cases cited *supra*; R. S. c. 79, § 18. *Ex parte Garland,* 4 Wallace, 378; *Ex parte Robinson,* 19 Wallace, 512.

*Benjamin Kimball,* in his own behalf.

Courts will only remove attorneys for contempt or for fraudulent and corrupt practices in his capacity and employment as an attorney and counsellor at law. Over this class of cases they will exercise their summary jurisdiction, but will leave the party complaining to his civil and criminal prosecution for all irregular or dishonest acts committed in a private capacity or employment, where a jury can be empannelled to pass upon the facts. *Bryant's case,* 24 N. H., 154; *Short* v. *Pratt,* Bing., 102 ; *In re Knight,* Ib., 142 ; *In re Morris,* 2 Ad. & El., 582 : *Ex parte Boderlour,* 8 Ad. & El., 359.

The pardon disposes of the charge of forgery and all its consequences. *Ex parte Garland,* 4 Wallace, 378.

DICKERSON, J. This is a complaint for the removal of the respondent from his office as attorney and counsellor at law. The complaint which is in the form of a motion signed by A. Sanborn, Esq., of and for the Penobscot bar, prays for a rule upon the respondent to show cause why he should not be removed from the office of attorney and counsellor at law of this court upon and for the following charges, to wit : "that he does not possess a good moral character, in that at the February term of said court, A. D. 1860, he was convicted of the crime of forgery, and at the next August term of said court he was sentenced to confinement to hard labor in the state prison for the term of three years ; and in this that he has been guilty of repeated dishonest if not criminal acts ; and in one instance if not more, of obtaining money by false pretences ; and of unprofessional practice in this, that he has wittingly promoted and sued false and groundless suits, and otherwise violated his oath, and the duties of his said office."

An attorney at law is an officer of the court as appears from the terms of his oath of office, to wit : "you will conduct yourself in the office of an attorney within the courts according to the best of your knowledge and discretion, and with all good fidelity, as well to the courts as your clients." The order of his admission to the bar is the judgment of the court that he possesses the

requisite legal qualifications and good moral character to entitle him to practice the profession of an attorney at law. From the moment of his entrance upon the duties of his office, he becomes responsible to the court for his official misconduct. The tenure of his office is during good behavior, and he can only be deprived of it for misconduct ascertained and determined by the court after opportunity to be heard has been afforded. In the absence of specific provision to the contrary the power of removal is commensurate with the power of appointment. *Ex parte Garland*, 4 Wall., 378 ; case of *Austin et als.*, 5 Rawle, 203.

When we consider the duties and powers devolved upon an attorney at law in virtue of his office and the temptations to abuse his professional franchise, the importance and necessity of the power of the court to remove him from the bar can scarcely be over-stated. An attorney at law in general may waive objections to evidence, make admissions in pleading or by parol, enter nonsuits and defaults, and make any admission of facts and any disposition of suits that his clients could make. Upon his advice and conduct in the management of causes the protection of the property, reputation and even the life of his client in a great degree is not unfrequently made to depend. In order to fit him for this trust the possession of a character fortified by high moral principle is indispensable. The statute makes "a good moral character" a condition precedent to his admission to the bar. By his admission the court hold him out to the public as worthy of public confidence and patronage. Upon this indorsement by the court the public have a right to rely, and to presume that his moral character continues to stand approved by the court. If "a good moral character" is indispensable to entitle one to admission to the bar, it is obvious that the necessity for its continuance becomes enhanced by the conflicts, excitements and temptations to which the practitioner is daily liable. For his official misconduct there is no power of removal but in the court. This power therefore is at once necessary to protect the court, preserve the purity of the administration of justice, and maintain the integrity of the

bar. "The power of removal," says Bigelow, C. J., in *Randall's case*, cited *post*, "was given not as a mode of inflicting a punishment for an offence, but in order to enable the courts to prevent the scandal and reproach which would be occasioned to the administration of the law by the continuance in office of those who had violated their oaths or abused their trust, and to take away from such persons the power and opportunity of injuring others by further acts of misconduct and malpractice."

The power of removal however is a judicial power, to be exercised by a sound judicial discretion, and in accordance with well-established principles of law where the evidence is of a conclusive character. But while its use calls for judicial discretion, it also invokes judicial firmness.

The proceedings for the removal of an attorney at law do not partake of the nature of a criminal procedure in which a party has a right to insist upon a full, formal and technical description of the matter with which he is charged. They are usually commenced by motion to the court, setting forth the misconduct of the attorney in terms that may be readily comprehended by him, and praying for a rule on him to show cause why he should not be removed from the bar for the causes assigned. This course was pursued in the case at bar. The motion contains the general charge that "the respondent does not possess a good moral character," and then states in general terms the acts by which he has forfeited his claim to such character. We think the motion is sufficiently specific to advise the respondent of the charges he is required to meet, and if sustained by the evidence affords sufficient ground for his removal from his office as attorney at law. *Randall*, petr. for mandamus, 11 Allen, 470.

The causes for which an attorney at law may be removed from the bar from the nature of the case are diverse and numerous. He may be removed for violating his official oath ; for conviction of perjury or other felony ; for attempting to get an opposing attorney drunk in order to obtain advantage of him in the trial of a cause ; for obtaining money of his client by false pretences ;.

for advocating the admission in evidence of a forged copy of a letter, knowing it to be forged when offered by his associate counsel; for ceasing to possess "a good moral character;" and for any ill practice attended with fraud and corruption, and committed against the principles of justice and common honesty.  *Ex parte Bramhall*, Coop., 829; *Austin's case*, cited *ante*; *Dickens' case*, 67 Penn. St. R., 169; *People* v. *Ford*, 54 Ill., 520; *Rice* v. *Commonwealth*, B. Monroe, 484; *Mills' case*, 1 Mann, 393; *In re Percy*, 36 N. Y., 651; *Bryant's case*, 24 N. H., 155; *Burr's case*, 1 Wheeler's Crim. L., 503; *Leigh's case*, 1 Munf. ,481.

It is a mistaken view of this subject as the foregoing authorities show, to conclude that an attorney at law can only be disbarred for acts done "in his office as attorney," or "within the courts," in the terms of his oath of office.  On the contrary an attorney may be guilty of disreputable practices and gross immoralities in his private capacity and without the pale of the court, which render him unfit to associate with gentlemen, disqualify him for the faithful discharge of his professional duties in or out of court, and render him unworthy to minister in the forum of justice.  When such a case arises from whatever acts or causes, the cardinal condition of the attorney's admission to the bar, the possession of "a good moral character," is forfeited, and it will become the solemn duty of the court upon a due presentment of the case to revoke the authority it gave the offending member as a symbol of legal fitness and moral uprightness, lest it should be exercised for evil or tarnished with shame.

In *Leigh's case*, cited *ante*, Judge Roane says: "None are permitted to act as attorneys at law but those who are allowed by the judges to be skilled in law, and certified by the court to be persons of honesty, probity and good demeanor.  Having obtained the sanction of the court touching these two particulars, an attorney is licensed or allowed to practice, and the court have also a continuing control over him, with power to revoke his license for unworthy practices or behavior."

In *Percy's case*, cited *ante*, the court say : "It is insisted by

Penobscot Bar *v.* Kimball.

the appellant that the misconduct justifying the removal is some deceit, malpractice, or misdemeanor practiced or committed in the exercise of the profession only and that general bad character or misconduct will not sustain the proceedings. We cannot concur in this position. It has been seen that the right of admission to practice is made by the statute to depend upon the possession of a good moral character joined with the requisite learning and ability. It is equally important that this character be preserved after admission while in the practice of the profession, as that it should exist at the time. It would be an anomaly in the law to make good moral character a prerequisite to admission to an office of a life tenure, while no provision is made in case such character is wholly lost."

In *Mills' case*, cited *ante*, the court held that a bad moral character is good cause for disbarring an attorney. In that case Whipple, C. J., remarks as follows : "Should this court after being officially advised that one of its officers has forfeited the good name he possessed when permitted to assume the duties of his office, still hold him out to the world as worthy of confidence, they would in my opinion fail in the performance of a duty cast upon them by the law. It is a duty they owe to themselves, to the bar and the public, to see that a power which may be wielded for good or for evil is not entrusted to incompetent or dishonest hands. The extreme judgment of expulsion is not intended as a punishment inflicted upon the individual, but as a measure necessary to the protection of the public, who have a right to demand of us that no person shall be permitted to aid in the administration of justice whose character is tainted with corruption."

Upon passing from the law to the facts in the case before us, we find that the first specification relied on to establish the general charge that "the respondent does not possess a good moral character" is proved. He was "sentenced to confinement and hard labor in the state prison for the term of two years," as charged in the motion. The crime for which he was convicted and sentenced was the forgery of a deposition and caption thereto

annexed which were offered in evidence by him, and admitted by the court on the trial of a libel for divorce brought by him against his wife, Marilla Kimball.

But we further find that he has been pardoned by the executive for that offence. The effect of that pardon is not only to release the respondent from the punishment prescribed for that offence and to prevent the penalties and disabilities consequent upon his conviction thereof, but also to blot out the guilt thus incurred, so that in the eye of the law he is as innocent of that offence as if he had never committed it. The pardon as it were makes him a new man in respect to that particular offence, and gives him a new credit and capacity. To exclude him from the office he held when he committed the offence is to enforce a punishment for it notwithstanding the pardon. *Ex parte Garland*, 4 Wallace, 380.

But the respondent in his capacity as attorney offered the deposition and caption forged by him as evidence in court, and they were admitted. This act was a palpable violation of his official oath which bound him "to do no falsehood nor consent to the doing of any in court." It was also an indignity offered to and a fraud upon the court and the law. By that act the respondent not only struck a fearful blow at the administration of justice but he betrayed confidence, practiced deceit, degraded himself and turned recreant to virtue. It is obvious that an attorney at law who is guilty of such an act does not possess that "good moral character" which the statute makes a prerequisite for admission to the bar and which is indispensable in the practice of the profession. *Rice* v. *Commonwealth*, 18 B. Monroe, Ky., 475.

The executive pardon affords the respondent no protection from the consequences which the law attaches to this offence. Pardon for one crime does not release a party from the penalties and disabilities consequent upon the commission of another. A pardon for forgery does not prevent a party from suffering the consequences attached to a conviction for adultery or larceny, nor blot out the guilt inseparable from such crimes and give their perpe-

trator a new character for chastity and honesty. The indictment upon which the respondent was convicted contains no count for a violation of his official oath or for a fraud upon the court. The respondent's pardon for forgery can no more obliterate the stain of guilt for those offences than the judgment in that case would be a bar to an indictment for their commission.

Nor has that act been condoned by lapse of time. Though the respondent's conviction and sentence took place in 1860, the delay has not been very considerable if we take into account the term of his imprisonment and his absence from the state. The offended husband or wife not unfrequently consents to continue or resume the relations of wedlock in the hope of an improved state of things without intending to condone previous causes of grievance, should such hope prove delusive. For the same reason also the court sometimes suspends sentence or even forbears to pronounce it. The forbearance in this case was doubtless prompted by the hope of an improvement. However this may be, the respondent has no legal or moral ground to complain that he has been suddenly or summarily dealt with or that he has been allowed an opportunity for repentance and reformation. How he has improved the interval granted him the sequel shows.

We also find the respondent guilty of dishonesty and bad faith toward his client, Thomas Frost. The evidence shows that Frost gave the respondent a retainer of $10 to defend him from an indictment for an assault with an intent to commit murder, and $20 more when the court was in session; that the respondent examined Frost's witnesses and told him to discharge them, and "to leave the case with him to fix up;" that "he had seen the parties and if Frost would let him have the money he would fix it up right away."

The respondent wanted $200 for that purpose which Frost let him have, and then went home. Upon being advised by his bondsman to return to court and look after his bond, Frost returned, found that nothing had been done, but was again assured by the respondent "that something would be done in a day or two." Nothing however was done and Frost demanded the $200 of the

respondent but recovered only $55, the balance being claimed by him for his services in the case.

The crime charged was one that the law does not allow to be compromised by the parties. The respondent was poor and Frost was in good credit. Neither the injured party nor the county attorney was introduced to show what efforts if any the respondent made to adjust the matter. Nor did the respondent offer his own testimony to remove the cloud that rests upon his professional conduct in this transaction. The evidence forces upon us the conviction that the respondent dealt falsely and dishonestly with his client and in a manner utterly inconsistent with that "good moral character" which he should have possessed. The pretence that the respondent had a right to retain the money for his services is too transparent to mislead any discerning mind. The evidence shows that the money retained by him was not and could not have been obtained for that purpose and that not a tithe of it was earned by him in the cause.

The specification of dishonest practices in obtaining money is established in several instances. The evidence shows that he went to Etna and obtained thirty dollars of Samuel R. Dennett, a farmer of that town whose acquaintance he had made the February previous while Dennett was attending court as a juror, upon the false statement that John C. Friend of Etna owed him sixty dollars. The respondent has never refunded the money though he promised to do so on the next day. He also obtained fifteen dollars of Seth Emery of Bangor, at an early hour in the morning upon the representation that he had a check on which he expected to get the money and would pay the money as soon as the bank was opened. He never paid the money and in the absence of any explanatory or exculpatory evidence to the contrary which it was in the power of the respondent to offer if any such existed, the inference is irresistible that he had no such check as he pretended to have. In another instance he obtained twelve dollars from a gentleman in Waterville upon representing that he had lost his pocket-book, was doing an extensive business in Philadelphia and had no money

to pay for his team and hotel bills, and upon his promise to remit the amount the next day from Bangor. As he neither sent the money nor would answer the gentleman's letters, the latter caused him to be arrested at the hotel in Waterville and thus collected his debt. His largest operation in the same direction that has been disclosed in this proceeding is in the case of William P. Tenney, who let him have some fourteen hundred dollars at different times, solely upon his express representation that it was intended to be used, and his agreement that it should be used, to purchase soldier's scrip or bounty, and that Tenney should have one half of the profits. After the earnest efforts of Tenney to obtain satisfaction, the result was his recovery of $400, the confession of Kimball that he had invested the balance in real estate in Sidney, and the tender of his worthless note for that amount. Other instances there are of successes and failures in obtaining money by means scarcely less disreputable though not so palpably dishonest.

As instances of unprofessional conduct and a disregard of the amenities of the profession may be mentioned his calling E. C. Brett, Esq., a member of the Penobscot bar and clerk of this court, a liar ; in causing the name of Henry L. Mitchell, Esq., also a member of that bar to be erased under an action without authority and in having his own name inserted instead, and in putting his own name under an action defended by James W. Donigan, Esq., another member of said bar without authority and threatening "to flog him in the street if it was stricken off."

The specification of wittingly promoting and suing groundless suits is not sustained. In the one instance adduced the verdict of the jury was in favor of the respondent, then plaintiff, for nominal damages, and in the other the declaration seems to set forth good cause of action, whatever the proof may turn out to be, and as a jury may be called upon to try it, the court will not presume be forehand to pronounce it false and groundless.

Our conclusion is that independently of the act of the respondent in offering the forged deposition and caption as evidence in court, the allegation in the motion that "the respondent does not

possess a good moral character" is clearly established.  With the
evidence of that fact the case does not admit of a scintilla of doubt.
The evidence discloses not merely a single instance of moral delin-
quency, disreputable practice and professional misconduct, but a
series of them, showing the respondent to be unfit and unsafe to
be intrusted with the powers, duties and responsibilities of the legal
profession.  No court would for a moment consider the claims of
an applicant for admission to the bar who should be shown to pos-
sess such a moral character.  If the violation of his oath of office,
fraud upon the court, bad faith toward clients, dishonesty in his
dealings as an individual and disregard of the courtesies and pro-
prieties due to the other members of the profession should operate
a forfeiture of the office of an attorney, the respondent has no
longer any claim or right to enjoy that office.

Unpleasant as is the duty, grave as is the responsibility devolved
upon us, and serious as must be the consequences to the respond-
ent, we cannot forbear to pronounce the extreme judgment of re-
moval without failing to discharge the high trust which the law
reposes in us and which is indispensable to the maintenance of the
dignity of the bench, the integrity of the bar and the purity of
the administration of justice.  Indeed to refuse to do so in this
case would be virtually to abdicate this trust and render the law
creating it a nullity.  The guaranty which the law in this behalf
provides for the security of the public must be maintained inviolate.

We have carefully examined all the respondent's objections to
the proceedings before the court at *nisi prius* including his mo-
tions to dismiss, strike out and quash, and also to reject and amend
the report of the commissioner, but we find nothing in them for
which he has any legal ground of complaint.  The objection that
the commissioner to take the testimony was not sworn is not well
taken.  Assessors, auditors and referees appointed by the court
are not required to be sworn nor is a commissioner to take evi-
dence.  So also was it competent for the judge to receive the com-
plaint and grant the rule to show cause at chambers returnable to
the court in session.  As we have before seen the same strictness,

formality and technicality are not required in this proceeding as are requisite in other cases.

The judgment must be

*The respondent to be removed from his office as attorney at law in all the courts of this state.*

APPLETON, C. J., DANFORTH, VIRGIN and PETERS, JJ., concurred.

LIBBEY, J., having been consulted did not sit.