## EX PARTE WALL.

A rule was made by the Circuit Court of the United States for the Southern District of Florida, which, after reciting that it had come to the knowledge of the court that W., an attorney of the court, did, on a day specified, engage in and with an unlawful, tumultuous, and riotous gathering, he advising and encouraging thereto, take from the jail of Hillsborough County, and hang by the neck until he was dead, one John, otherwise unknown, thereby showing such an utter disregard and contempt for the law which, as a sworn attorney, he was bound to support, as shows him to be totally unfitted to occupy such position: thereupon cited him to appear at a certain time and show cause why his name should not be stricken from the roll. The attorney appeared, and answered, denying the charge in mass, and excepting to the jurisdiction of the court, (1) because there was no charge against him under oath, (2) because the offence charged was a crime by the laws of Florida for which he was liable to be indicted and convicted. The court overruled the exceptions, and called a witness who proved the charge, showing that the hanging took place before the court-house door, during a temporary recess of the court; thereupon the court made an order striking W.'s name from the roll. On motion made here for a *mandamus* to compel the judge of that court' to reverse this order, and he having answered the rule, showing the special circumstances of the case, — *Held*, 1. That although not strictly regular to grant a rule to show cause why an attorney should not be struck off the roll, without an affidavit making charges against him, yet that, under the special circumstances of this case, the want of such affidavit did not render the proceeding void-as *coram non judice*. 2. That the acts charged against the attorney constituted sufficient ground for striking his name from the roll. 3. That although, in ordinary cases, where an attorney commits an indictable offence, not in his character of attorney, and does not admit the charge, the courts will not strike his name from the roll until he has been regularly indicted and convicted, yet that the rule is not an inflexible one; that there may be cases in which it is proper for the court to proceed without such previous conviction; and that the present case, in view of its special circumstances, the evasive denial of the charge, the clearness of the proof, and the failure to offer any counter proof, was one in which the court might lawfully exercise its summary powers. 4. That the proceeding to strike an attorney from the roll is one within the proper jurisdiction of the court of which he is an attorney, and does not violate the constitutional provision which requires an indictment and trial by jury in criminal cases; that it is not a criminal proceeding, and not intended for punishment, but to protect the court from the official ministration of persons unfit to practise as attorneys therein. 5. That such a proceeding is not an invasion of the constitutional provision that no person shall be deprived of life, liberty, or property without due process of law; but that the proceeding itself, when instituted in proper cases, is due process of law. 6. That, as the court below did not exceed its powers in taking cognizance of the case, no such irregularity occurred in the proceeding as to require this court to interpose by the writ of *mandamus*.

Petition for *mandamus*.

The case is fully stated in the opinion of the court.

*Mr. Charles W. Jones* for the petitioner.

Mr. Justice Bradley delivered the opinion of the court.

A petition was filed in this case by J. B. Wall for an alternate writ of *mandamus* to be directed to James W. Locke, district judge of the United States for the Southern District of Florida, to show cause why a peremptory writ should not issue to compel him to vacate an order made by him as such district judge, prohibiting said Wall from practising at the bar of said court, and to restore said Wall to the rights, privileges, and immunities of an attorney and proctor thereof. The petition set forth the proceedings complained of, and an order was made by this court requiring the judge to show cause why the prayer of the petition should not be granted. The rule to show cause has been answered, and we are now called upon to decide whether the writ ought to be granted.

The proceedings of the court below for disbarring the petitioner were substantially as follows: —

On the 7th of March, 1882, during a term of the said court, held at Tampa, Hillsborough County, Florida, the same court exercising both Circuit and District Court jurisdiction, J. W. Locke, the judge then holding said court, issued, and caused to be served upon the petitioner, the following order: —

"Circuit Court of the U. S., So. District of Florida.
"March Term, 1882.

"Whereas it has come to the knowledge of this court that one J. B. Wall, an attorney of this court, did, on the sixth day of this present month, engage in and with an unlawful, tumultuous, and riotous gathering, he advising and encouraging thereto, take from the jail of Hillsborough County, and hang by the neck until he was dead, one John, otherwise unknown, thereby showing such an utter disregard and contempt for the law and its provisions, which, as a sworn attorney, he was bound to respect and support, as shows him to be totally unfitted to occupy such position:

"It is hereby ordered that said J. B. Wall be cited to appear and show cause by eleven o'clock Wednesday, the eighth instant,

why his name should not be stricken from the roll of attorneys, and he be disbarred and prohibited from practising herein.

.ʺ (Signed)          JAMES W. LOCKE, *District Judge.*
"TAMPA, FLORIDA, March 7, 1882."

Wall appeared in court at the return of this rule, and, on the following day, filed a written answer, as follows: —

" This respondent, now and at all times hereafter saving and reserving to himself all and all manner of benefits of exception to the many errors, uncertainties, and imperfections in the said rule contained, prays leave to object, as if he had demurred thereto, to the right, authority, or jurisdiction of this court to issue said rule and require him to answer it:

" 1st, Because said rule does not show that the matters therein charged took place in the presence of the court, or were brought to the knowledge of the court by petition or complaint in writing under oath; and,

" 2d, Because respondent is charged in said rule with a high crime against the laws of Florida not cognizable in this court, and for which, if proven, this respondent is liable to indictment and prosecution before the State court; but for answer to so much of said rule as this respondent is advised that it is material or proper for him to make answer to, answering, saith —

" He denies counselling, advising, encouraging, or assisting an unlawful, tumultuous, and riotous gathering or mob in taking one John from the jail of Hillsborough County and causing his death by hanging in contempt and defiance of the law, or that he has been guilty of any unprofessional or immoral conduct which shows him to be unfitted for the position of an attorney and proctor of this court, as he is charged in the said rule.

. " Whereupon he prays to be hence dismissed, &c.
" (Signed)          .          . J. B. WALL."

The court overruled the exceptions to its jurisdiction, and called to the stand Peter A. Williams, the marshal of the district, whose testimony, at the request of the respondent, was reduced to writing, and was as follows: —

" Peter A. Williams, being duly sworn to testify, says: —

" I saw Mr. J. B. Wall and others come to Mr. Craft's house about two o'clock, March 6th, and having already heard that a sheriff's posse had been summoned to protect the jail, I thought by

the orderly manner they came in that it was the sheriff's posse coming for instructions. I was sitting on the end of the piazza, and did not go in the house, but sat there till they came out, thinking they had come for instructions.

"When they came out I heard one of the party remark, 'We have got all out of you we want.' Mr. Wall was one of the party.

"I then thought something was wrong; they all went out of the gate, and Mr. Craft after them, and I followed after them rather slowly, and when I got to the corner I saw the party coming out of the jail with the criminal, the man who was afterwards hanged. They carried him over the steps to the oak tree in front of the steps to the court-house. The crowd gathered around him, and some one threw the man down. I saw him then put on a dray, and afterwards pulled up on the tree. There was a crowd of about a hundred persons there. I don't think I could name any man in that crowd except the sheriff, who was there protesting, as I had come away from the crowd and was on the upper piazza of the court-house. I heard the man hollowing. He was put on a dray with a rope around his neck. The dray went off and he fell to the ground about ten feet from a perpendicular; then the crowd pulled the rope and he went up. The crowd had their backs towards me. I suppose I could have identified some one if I had thought to, but I was excited and did not notice who they were. I saw Mr. Wall coming from the jail with the prisoner until they crossed the fence; then I did not see him any more until after it was over. I did not see him leave the crowd, though he might have done it without my seeing it. When going from the jail to the tree Mr. Wall, I think, had hold of the prisoner; he was beside him.

"I did not see him afterwards until the hanging was over, then the crowd had increased, perhaps, to 200 persons, and I went down to them to the plank-walk.

"This was Monday of this week, the 6th of this month, I think, in Tampa, Hillsboro' County.

"I also saw Mr. Sparkham, the mayor of the city, protesting at the time of the hanging."

To cross-questions he says:—

"When the man fell from the dray he fell his full length to the ground; the rope was slack."

On the next day the court, after argument by respondent's counsel, made an order in the case, "That J. B. Wall be pro-

hibited from practising at the bar of this court until a further order herein." ·

The answer of Judge Locke to the rule granted by this court to show cause why a *mandamus* should not issue, states: —

"That during a session of the Circuit and District Courts of the United States at Tampa, in said Southern District of Florida, he, the said James W. Locke, presiding, on the sixth day of March, A. D. 1882, at the adjournment of said courts for dinner, at about one o'clock of said day, as he was passing from the court-house, a prisoner was being brought to the jail in the same yard by two officers; that upon his return to the court-house after dinner, in a little more than an hour, the dead body of the same prisoner hung from the limb of a tree directly in front of the court-house door; whereby he became personally informed of the commission of a most serious offence against the laws. The same afternoon he was informed of the active participation in said crime of one J. B. Wall, an attorney of said court, by an eye-witness in whom the most implicit confidence could be placed, but who declined to make any charge or affidavit of such fact on account of a fear of said Wall's influence and the local feeling it would cause against him, the said witness.

"That not only from the direct statements of eye-witnesses, but from numerous other sources, reliable information of like import was received; whereupon said J. B. Wall, your petitioner, was, on the said seventh day of March, during a session of the Circuit Court of the United States, in open court, charged in writing by the respondent herein, as judge, with having, with an unlawful, tumultuous, and riotous gathering, he advising and encouraging thereto, taken from the jail of Hillsborough County, and hanged to a tree by the neck until he was dead, a man to the court known only as John; and cited by rule served upon him to show cause by eleven o'clock A. M. of the next day, the eighth day of said March, why his name should not be stricken from the roll of attorneys and he prohibited from practising in the U. S. courts of said district.

"That at said time of return, said J. B. Wall appeared in person, and by counsel, and moved that whereas said rule had charged him with a criminal offence, indictable by the grand jury of the courts of the State, the matter be continued until after the meeting of such grand jury; and the matter was held under advisement by the court and continued until next day.

"That at the opening of the court the next day, before any order had been made upon the pending motion, came said J. B. Wall,

and withdrew said motion for continuance, and filed answer demurring to the right of the court to issue the rule served upon him, because [stating the contents of Wall's answer], and demanded that proof be had of the matter charged.

"That thereupon Peter A. Williams, Esq., U. S. marshal for said district, being duly sworn, testified as follows: [stating the testimony of Williams, as before given.]

"Whereupon J. B. Wall, being himself present and stating that he had no testimony to offer, and desiring to be heard by counsel, was so heard, and the court took the matter under consideration.

"Afterwards, to wit, on the tenth day of March aforesaid, the matter having been fully and duly considered, it was ordered that J. B. Wall be prohibited from practising at the bar of Circuit or District Courts of this district until further order therein.

"All of which matters are true, and as far as relate to the action of the court therein shown and set forth in the records of said court and the papers therein.

"And, further answering, he says that J. B. Wall at no time denied active participation in the hanging as charged, nor answered the spirit and substance of said charge.

"That when the motion for continuance was withdrawn by him, and the demand made that proof be made of the charge, upon inquiry your respondent ascertained that both the sheriff and mayor, who had alone opposed the action of the mob, and the only parties present not active participants, were absent from the city, and could not be summoned to testify without unadvisable delay; of all of which said J. B. Wall had knowledge.

"That on account of the excited state of feeling existing at the time, the timidity of many, from the influential position of some of those engaged in the hanging, and the sympathy of others with the lynchers, it was not advisable to attempt to compel any resident of said city of Tampa who was found to have personal knowledge of the matter, to testify against said J. B. Wall.

"That said J. B. Wall had every opportunity to explain his presence and action in the matter as proven, if innocent, but made no attempt to do so.

"That the evidence, although of but a single witness, for grounds already stated, was to your respondent positively conclusive beyond a reasonable doubt that said J. B. Wall had been guilty of active participation in a most immoral and criminal act, and a leader in a most atrocious murder, in defiance and contempt of all law and justice, and had thereby shown himself unfitted to longer retain the

position of an attorney in any court over which your respondent might have the honor to preside.

"Wherefore and upon which showing your respondent would most humbly submit to your Honors that said order prohibiting said J. B. Wall from practising as attorney should not be revoked nor he restored to the rights and privileges of an attorney of said courts

"James W. Locke,

"U. S. Dis. Judge, So. Dis. Fla.

"Key West, Fla., Dec'r 2, 1882."

It will be perceived that the rule to show cause, which was served upon the petitioner, contained a definite charge of a very heinous offence, and that an opportunity was given to him to meet it and to exonerate himself if he could do so. It would, undoubtedly, have been more regular to have required the charge to be made by affidavit, and to have had a copy thereof served (with the rule) upon the petitioner. But the circumstances of the case, as shown by the return of the judge, seem to us to have been sufficient to authorize the issuing of the rule without such an affidavit. The transaction in which the petitioner was charged with participating was virtually in the presence of the court. It took place in open day, in front of the court-house, and during a temporary recess of the actual session of the court; and the awful result of the lawless demonstration was exhibited to the judge on his return to the court-room. Under the intense excitement which prevailed, it is not wonderful that no person could be found willing to make a voluntary charge against the petitioner or any one else; and yet, the fact that he was engaged as one of the perpetrators was so notorious, and was brought to the judge's knowledge by information so reliable and positive, that he justly felt it his duty to take official notice of it, and to give the petitioner an opportunity of repelling the charge. This was done in such a manner as not to deprive him of any substantial right. The charge was specific, due notice of it was given, a reasonable time was set for the hearing, and the petitioner was not required to criminate himself by answering under oath. In *Ex parte Steinman and Hensel*, 95 Pa. St. 220, where the county court on its own motion had cited the parties before it for

publishing a gross libel upon the court, and had struck their names from the roll, though, on appeal, the order was reversed on other grounds, as to the mode of initiating the proceedings, Chief Justice Sharswood, delivering the opinion of the court, said: " We entertain no doubt that a court has jurisdiction without any formal complaint or petition, upon its own motion, to strike the name of an attorney from the roll in a proper case, provided he has had reasonable notice, and been afforded an opportunity to be heard in his defence." In the case of *Randall* v. *Brigham*, 7 Wall. 523, 539, which was an action for damages brought by an attorney against a judge for striking his name from the roll unjustly and without authority, not having before him in making the order to show cause any charge of misconduct, except only a letter of a third person addressed to the grand jury; this court, speaking by Mr. Justice Field, said: " But the claim of the plaintiff is not correct. The information imparted by the letter was sufficient to put in motion the authority of the court, and the notice to the plaintiff was sufficient to bring him before it to explain the transaction to which the letter referred. The informality of the notice, or of the complaint by letter, did not touch the question of jurisdiction. The plaintiff understood from them the nature of the charge against him; and it is not pretended that the investigation which followed was not conducted with entire fairness. He was afforded ample opportunity to explain the transaction and vindicate his conduct."

Looking at all the circumstances of the present case, we are not prepared to say that the course which was pursued rendered the proceedings void, as being *coram non judice*. And since they were not void (though not strictly regular), and since no substantial right of the petitioner was invaded, we do not think that the mere form of the proceeding requires us to interpose by the extraordinary remedy of *mandamus*.

The next question to be considered is, whether the facts charged against the petitioner constitute a legitimate ground for striking his name from the roll. Of this we think there can be no doubt. It is not contended but that, if properly proven, the facts charged are good cause for removal from the bar. A moment's consideration will be sufficient to demonstrate this.

It is laid down in all the books in which the subject is treated, that a court has power to exercise a summary jurisdiction over its attorneys to compel them to act honestly towards their clients, and to punish them by fine and imprisonment for misconduct and contempts, and, in gross cases of misconduct, to strike their names from the roll. If regularly convicted of a felony, an attorney will be struck off the roll as of course, whatever the felony may be, because he is rendered infamous. If convicted of a misdemeanor which imports fraud or dishonesty, the same course will be taken. He will also be struck off the roll for gross malpractice or dishonesty in his profession, or for conduct gravely affecting his professional character. In Archbold's Practice, edition by Chitty, p. 148, it is said: "The court will, in general, interfere in this summary way to strike an attorney off the roll, or otherwise punish him, for gross misconduct, not only in cases where the misconduct has arisen in the course of a suit, or other regular and ordinary business of an attorney, but where it has arisen in any other matter so connected with his professional character as to afford a fair presumption that he was employed in or intrusted with it in consequence of that character." And it is laid down by Tidd that "where an attorney has been fraudulently admitted, or convicted (after admission) of felony, or other offence which renders him unfit to be continued an attorney, or has knowingly suffered his name to be made use of by an unqualified person, or acted as agent for such person, or has signed a fictitious name to a demurrer, as and for the signature of a barrister, or otherwise grossly misbehaved himself, the court will order him to be struck off the roll." 1 Tidd's Practice, 89, ed. 9. Where an attorney was convicted of theft, and the crime was condoned by burning in the hand, he was nevertheless struck from the roll. "The question is," said Lord Mansfield, "whether, after the conduct of this man, it is proper that he should continue a member of a profession which should stand free from all suspicion. . . . It is not by way of punishment; but the court in such cases exercise their discretion, whether a man whom they have formerly admitted is a proper person to be continued on the roll or not."

Now, what is the offence with which the petitioner stands

charged? It is not a mere crime against the law; it is much more than that. It is the prostration of all law and government; a defiance of the laws; a resort to the methods of vengeance of those who recognize no law, no society, no government. Of all classes and professions, the lawyer is most sacredly bound to uphold the laws. He is their sworn servant; and for him, of all men in the world, to repudiate and override the laws, to trample them under foot, and to ignore the very bands of society, argues recreancy to his position and office, and sets a pernicious example to the insubordinate and dangerous elements of the body politic. It manifests a want of fidelity to the system of lawful government which he has sworn to uphold and preserve. Whatever excuse may ever exist for the execution of lynch law in savage or sparsely settled districts, in order to oppose the ruffian elements which the ordinary administration of law is powerless to control, it certainly has no excuse in a community where the laws are duly and regularly administered.

But besides the character of the act itself, as denoting a gross want of fealty to the law and repudiation of legal government, the particular circumstances of place and time invest it with additional aggravations. The United States court was in session; this enormity was perpetrated at its door; the victim was hanged on a tree, with audacious effrontery, in the virtual presence of the court! No respect for the dignity of the government as-represented by its judicial department was even affected; the judge of the court, in passing in and out of the place of justice, was insulted by the sight of the dangling corpse. What sentiments ought such a spectacle to arouse in the breast of any upright judge, when informed that one of the officers of his own court was a leader in the perpetration of such an outrage?

We have no hesitation as to the character of the act being sufficient to authorize the action of the court.

A question of greater difficulty is raised as to the legality of proceeding in a summary way on a charge of this nature. It is strenuously contended that when a crime is charged against an attorney for which he may be indicted, and the truth of the charge is denied or not admitted by him, it cannot be made the

. ground of an application to strike his name from the roll until he has been regularly convicted by a jury in a criminal proceeding; or, at least, that this is true, when the act charged was not committed in his professional character.

As, in urging this argument, much stress is laid upon the fact that the petitioner, by his answer, denied the charge contained in the rule to show cause, it is proper to notice the manner in which this denial was made. The charge, as we have seen, was specific and particular: " That J. B. Wall, an attorney of this court, did, on the sixth day of this present month, engage in and with an unlawful, tumultuous, and riotous gathering, he advising and encouraging thereto, take from the jail of Hillsborough County and hang by the neck until he was dead, one John, otherwise unknown, thereby showing an utter disregard and contempt for the law and its provisions," &c. The denial of this charge was a mere negative pregnant, amounting only to a denial of the attending circumstances and legal consequences ascribed to the act. The respondent denied " counselling, advising, encouraging, or assisting an unlawful, tumultuous, and riotous gathering or mob in taking one John from the jail of Hillsborough County and causing his death by hanging, in contempt and defiance of the law." He was not required to answer under oath, and did not do so. Yet, free from this restriction, he did not come out fully and fairly and deny that he was engaged in the transaction at all; but only that he did not engage in it with · the attendant circumstances and legal consequences set out in the charge. Even the name · of the victim is made a material part of the traverse.

Upon such a special plea as this, we think the court was justified in regarding the denial as unsatisfactory. It was really equivalent to an admission of the substantial matter of the charge.

Nevertheless, the marshal of the court was called as a witness, and clearly proved the truth of the charge; and no evidence was offered in rebuttal. The case, as it stood before the court, was as clear of all doubt as if the petitioner had expressly admitted his participation in the transaction.

It is necessary, however, that we should examine the authorities on the question raised by the petitioner, as to the

power of the court to proceed against him without a previous conviction upon an indictment.

It has undoubtedly been held in some of the cases that where the offence is indictable, and the facts are not admitted, a regular conviction must be had before the court will exercise its summary jurisdiction to strike the name of the party off the roll. At first view this was supposed to be the purport of Lord Denman's judgment in the anonymous case reported in 5 Barn. & Adol. 1088. That was a case of professional misconduct in pecuniary transactions. Lord Denman is reported as saying: " The facts stated amount to an indictable offence. Is it not more satisfactory that the case should go to a trial? I have known applications of this kind after conviction, upon charges involving professional misconduct; but we should be cautious of putting parties in a situation where, by answering, they might furnish a case against themselves, on an indictment to be afterwards preferred. On an application calling upon an attorney to answer the matters of an affidavit, it is not usual to grant the rule if an indictable offence is charged." And the Solicitor-General, Sir John Campbell, who made the application in that case, being requested to look at the authorities, afterwards stated that he could find no precedent for it. In that case, however, the rule applied for was one requiring the attorney to answer charges on oath. On a similar application in a subsequent case charging perjury and fraud, *In re* ——, 3 Nev. & Perry, 389, Lord Denman said: " Would not an indictment for perjury lie upon these facts? We are not in the habit of interfering in such a case, unless there is something amounting to an admission on the part of the attorney, which would render the intervention of a jury unnecessary."

In another case in the Exchequer, *Ex parte* ——, 2 Dowl. P. C. 110, where an attorney had been sued in an action at law for an aggravated libel, and a verdict had been rendered against him with only one shilling damages; on an application being then made to strike him off the roll, Lord Lyndhurst said: " Have you any instance of such an application on a verdict for the same criminal act, but for which no criminal proceedings have been taken?" and intimated that if there was any such case, the rule would be granted, but added: " Here there was

conflicting evidence at the trial, and it is doubtful whether the publication was brought home to the defendant ; and the jury seemed to have so considered it : " and the rule was refused.

But this matter was carefully reviewed by the Court of Exchequer in the subsequent case of *Stephens* v. *Hill*, 10 Mee. & W. 28, where motion was made against an attorney who had conspired with others to induce a witness for the opposite party to absent himself from a trial, giving him money, &c. It was objected that the application to strike from the roll could not be heard on these charges without a conviction, inasmuch as a conspiracy is an indictable offence. Lord Abinger took a distinction between a rule to show cause why an attorney should not be struck off the roll, and a rule calling on him to answer the matters of an affidavit with a view to strike him off the roll. The latter course he conceded would be improper, if the offence was indictable, because it would compel the attorney to criminate himself ; but not so the former, for he might clear himself without answering under oath ; and that this was all that Lord Denman meant in the case before him. Lord Abinger said that as long as he had known Westminster Hall, he had never heard of such a rule as that an attorney might not be struck off the roll for misconduct in a cause merely because the offence imputed to him was of such a nature that he might have been indicted for it ; but he said that in the case of applications calling upon an attorney to answer the matters of an affidavit, he had known Lord Kenyon and Lord Ellenborough frequently say, You cannot have a rule for this purpose, because the misconduct you impute to the man is indictable ; but you may have one to strike him off the roll. After noticing and explaining the language attributed to Lord Denman, as before stated, Lord Abinger adds : " If, indeed, a case should occur where an attorney has been guilty of some professional misconduct for which the court by its summary jurisdiction might compel him to do justice, and at the same time has been guilty of something indictable in itself, but not arising out of the cause, the court will not inquire into that with a view of striking him off the roll, but would leave the party aggrieved to his remedy by a criminal prosecution."

This expression, about leaving the party aggrieved to his

remedy by a criminal prosecution, is frequently found in the English cases, and has reference to the practice in that country of regarding the party injured by the perpetration of a crime as the proper person to prosecute the offender; and one, indeed, upon whom a duty, in some sort, rested to institute such prosecution.    The court would, therefore, hesitate to take any summary action against the offender which might remove the inducements the injured party would otherwise have for proceeding criminally against him, and thus interfere with the course of justice.    In this country, the prosecution of criminal offences is generally committed to the charge of a public officer, and sufficient emolument is attached to the duty of prosecution to secure its faithful performance.    The same reason, therefore, does not exist here, as in England, for leaving it to the injured party to prosecute for the criminal offence.    So far as the offender himself is concerned, it is true, the reason is equally strong against compelling him to answer under oath charges preferred against him, and in favor of giving him a trial by jury in all cases of doubt or of conflicting evidence.    That a reluctance to interfere with the incentive to prosecute criminally in these cases operated strongly upon the judicial mind in England, is manifest from the fact, that after a prosecution had been made, and the duty of the injured party had been performed, the courts never hesitated to strike the accused from the roll, if found guilty by a jury, even though judgment against him had been arrested, or reversed, or the offence had been pardoned or condoned, *Rex* v. *Southerton*, 6 East, 126; *In the Matter of King*, 8 Q. B. 129; *In re Garbett*, 18 C. B. 403; thus showing that it is not a technical conviction which is required, but a fair effort on the part of the prosecutor to bring the offender to justice; coupled also with the fact that a jury is the most suitable tribunal for passing upon a question of fact depending upon conflicting evidence.

Some expressions in the cases cited, including the remarks made by Lord Abinger in *Stephens* v. *Hill*, seem to imply that the summary jurisdiction will not be exercised where the charges made against an attorney affect only his general character as such, and do not amount to malpractice in a particular cause.    But subsequent decisions are to the effect that it is

properly extended to cases affecting his general character also. Thus, in *Re Blake*, 3 El. & El. 34, an attorney was struck from the roll for having improperly collected the money due on a mortgage which he had pledged as collateral security for a loan, and which he borrowed from the pledgee on some false pretence.  On a rule to show cause and reference to the master, the facts were found to be truly charged; and although he was not acting as attorney in the matter, the court suspended his certificate for two years, on the general ground, as stated by Lord Chief Justice Cockburn, that where an attorney is shown to have been guilty of gross fraud, although not such as to render him liable to an indictment, nor committed by him while the relation of attorney and client was subsisting between him and the person defrauded, or in his character as an attorney, the court will not allow suitors to be exposed to gross fraud and dishonesty at the hands of one of its officers. And in a subsequent case, *Re Hill*, Law Rep. 3 Q. B. 543, where an attorney acting, not as such, but as clerk to a firm of attorneys, appropriated to his own use money which came to his hands on the sale of an estate; on a motion to strike his name from the roll, it was objected that, as his offence was indictable, a conviction was necessary before this proceeding could be had.  Lord Chief Justice Cockburn said: "No case has, so far as I am aware, come before the court under the precise circumstances under which this case presents itself, namely, of an act of delinquency committed by an attorney's clerk, who at the same time is an attorney, though at that time not acting as such; but still I think, on every principle of justice, we ought not the less to entertain the application. . . . If the delinquent had been proceeded against criminally upon the facts admitted by him, it is plain that he would have been convicted of embezzlement; and, upon that conviction being brought before us, we should have been bound to act.  If there had been a conflict of evidence upon the affidavits, that might be a very sufficient reason why the court should not interfere until the conviction had taken place; but here we have the person against whom the application is made admitting the facts."  Mr. Justice Blackburn, in the same case, said: "I think when we are called upon, in the exercise of our equitable

jurisdiction, to order an attorney to perform a contract, to pay money, or to fulfil an undertaking, there we have jurisdiction only if the undertaking or the contract is made in his character of attorney, or so connected with his character of attorney as to bring it within the power of the court to require that their officer should behave well as an officer. But where there is a matter which would subject the person in question to a criminal proceeding, in my opinion, a different principle must be applied. We are to see that the officers of the court are proper persons to be trusted by the court with regard to the interests of suitors, and we are to look to the character and position of the persons, and judge of the acts committed by them, upon the same principle as if we were considering whether or not a person is fit to become an attorney. . . . It should be considered whether the particular wrong done is connected with the character of an attorney. The offence morally may not be greater, but still, if done in the character of an attorney, it is more dangerous to suitors, and should be more severely marked. I agree that where it is denied that a criminal offence has been committed, the court ought not to decide on affidavits a question which ought to be tried before a jury."

This case is important as showing the latest consideration of the question by the English courts, and by the most eminent judges of those courts.

The rule to be deduced from all the English authorities seems to be this: that an attorney will be struck off the roll if convicted of felony, or if convicted of a misdemeanor involving want of integrity, even though the judgment be arrested or reversed for error; and also (without a previous conviction) if he is guilty of gross misconduct in his profession, or of acts which, though not done in his professional capacity, gravely affect his character as an attorney: but in the latter case, if the acts charged are indictable, and are fairly denied, the court will not proceed against him until he has been convicted by a jury; and will in no case compel him to answer under oath to a charge for which he may be indicted.

This rule has, in the main, been adopted by the courts of this country; though special proceedings are provided for by

statute in some of the States, requiring a formal information under oath to be filed, with regular proceedings and a trial by jury. The cases are quite numerous in which attorneys, for malpractice or other misconduct in their official character, and for other acts which showed them to be unfit persons to practise as attorneys, have been struck from the roll upon a summary proceeding without any previous conviction of a criminal charge. See, amongst others, the case of *Niven*, 1 Wheeler, Crim. Cas. 337, note ; *Ex parte Burr*, id. 503 ; s. c. 2 Cranch C. C. 379 ; *In the Matter of Peterson*, 3 Paige (N. Y.), 510 ; *Ex parte Brown*, 1 How. (Miss.) 303 ; *In the Matter of Mills*, 1 Mich. 392 ; *Ex parte Secombe*, 19 How. 9 ; *In re John Percy*, 36 N. Y. 651 ; *Dickens's Case*, 67 Pa. St. 169 ; *In re Hirst and Ingersoll*, 9 Phil. (Pa.) 216 ; *Baker* v. *Commonwealth*, 10 Bush (Ky.), 592 ; *Penobscot Bar* v. *Kimball*, 64 Me. 140 ; *Matter of George W. Wool*, 36 Mich. 299 ; *People* v. *Goodrich*, 79 Ill. 148 ; *Delano's Case*, 58 N. H. 5 ; *Ex parte Walls*, 64 Ind. 461 ; *In the Matter of Eldridge*, 82 N. Y. 161.

But where the acts charged against an attorney are not done in his official character, and are indictable, and not confessed, there has been a diversity of practice on the subject : in some cases it being laid down that there must be a regular indictment and conviction before the court will proceed to strike him from the roll ; in others, such previous conviction being deemed unnecessary.

The former view is taken, or seems to be assumed, in the cases we will now cite.

In an anonymous case, reported in 2 Halst. (N. J.) 162 (1824), where the charge was larceny, the court refused the rule to strike off the roll, because the offence was indictable, and there had been no conviction.

In *The State* v. *Foreman*, 3 Mo. 412, the court refused to disbar an attorney for passing counterfeit money, knowing it to be counterfeit, and escaping from prison before being convicted therefor ; the ground of refusal being that it was not a case within the Missouri statute, which required a conviction. Of course, being governed by the statute, this case is not in point.

In *Ex parte Fisher*, 6 Leigh (Va.), 619 (1835), Fisher commented to a jury in a manner which the judge deemed grossly

unprofessional and disrespectful to the court; and on the next day, after reciting the circumstances, made an order suspending his license for twelve months. This order was reversed by the Court of Appeals, on the ground that the party proceeded against must be regularly prosecuted by indictment or information, and found guilty by a jury. But as this decision was based upon a statute of Virginia, prescribing the course of proceeding, it is no authority on the point in question.

In *The State* v. *Chapman*, 11 Ohio, 430, an attorney had been charged with theft, and brought an action of slander therefor; the defendant pleaded the truth in justification, and obtained a verdict establishing his defence. Upon this, a rule was granted against the attorney to show cause why he should not be struck off the roll. He proved explanatory circumstances; and the court held that the verdict in the civil action was not sufficient to establish the charge of larceny, and discharged the rule.

In *Beene* v. *The State*, 22 Ark. 149, where the defendant had made an unwarrantable and atrocious personal attack upon the circuit judge for his action as judge; on application of the county bar to strike his name from the roll, the rule was granted; but the Supreme Court of Arkansas reversed the order, on the ground that the proceedings were irregular, and not in pursuance of the statute, which required regular charges to be exhibited, verified by affidavit, and a time fixed for hearing. The court also held that where the offence is indictable, there must be a regular conviction before the party can be struck off the roll; if not indictable, he was entitled to be tried by a jury. This case seems to have been decided upon the statutes of Arkansas.

In *Ex parte Steinman and Hensel*, 95 Pa. St. 220, the respondents published a libel against the judges of the Quarter Sessions of Lancaster County, Pennsylvania, accusing them of political motives in allowing a defendant to be acquitted. On being cited to show cause why they should not be struck off the roll, they took the ground, amongst other things, that they were charged with an indictable offence, and were entitled to a trial by jury. The court having made the rule absolute, they appealed, and the Supreme Court of Pennsylvania reversed the order. Chief Justice Sharswood, in delivering the opinion of

the court, said: " No question can be made of the power of a
court to strike a member of the bar from the roll for official
misconduct. . . . We do not mean to say that there may not
be cases of misconduct not strictly professional, which would
clearly show a person not to be fit to be an attorney, nor fit to
associate with honest men.   Thus, if he was proved to be a
thief, a forger, a perjurer, or guilty of other offences of the
*crimen falsi.*   But no one, we suppose, will contend that for
such an offence he can be summarily convicted and disbarred
by the court without a formal indictment, trial, and conviction
by a jury, or upon confession in open court."   Reference was
then made to a provision in the Bill of Rights of the Pennsyl-
vania Constitution of 1874, that " no conviction shall be had in
any prosecution for the publication of papers relating to the
official conduct of officers, &c., where the fact that such pub-
lication was not maliciously or negligently made, shall be
established 'to the satisfaction of the jury ; " and it was held
that this provision, at all events, entitled the parties to a jury
trial.

The cases now cited do undoubtedly hold, that where the
offence charged is indictable and is committed outside of the
attorney's professional employment or character, and is denied
by him, a conviction by a jury should be had before the court
will take action for striking his name from the roll.

There are other cases, however, in which it is held that a
previous conviction is not necessary.

In *Ex parte Burr*; 1 Wheeler, Criminal Cases, 503, s. c.
2 Cranch C. C. 379, the Circuit Court of the District of Co-
lumbia struck Burr off the roll on charges made by Mr. Key,
of various instances of malpractice, and also of dishonest con-
duct, in procuring deeds of property from persons in distress,
&c.   Burr objected, amongst other things, that he was entitled
to a trial by jury.   The court examined witnesses, who were
cross-examined by the defendant, and Chief Justice Cranch
delivered an elaborate opinion, concluding by making the ru'e
absolute for disbarring the accused, holding that proceedings
by attachment, as for contempt and to purify the bar of un-
worthy members, are not within those provisions of the Consti-
tution which guarantee a trial by jury.   This case was brought

to the attention of this court on an application for a *mandamus* to compel the Circuit Court to restore Burr to the bar, and the writ was refused. The court, by Chief Justice Marshall, expressed a disinclination to interpose unless the conduct of the court below was irregular or flagrantly improper; as where it had exceeded its power or decided erroneously on the testimony; and upon the testimony, it would be unwilling to interpose where any doubt existed.

*Fields* v. *The State*, Mart. & Y. (Tenn.) 168, was the case of a constable (but placed upon the same ground as that of attorneys), and the charge was, extortion. The Supreme Court of Tennessee, by Catron, J., held that a previous conviction was not necessary to enable the court below to suspend from office; that the constitutional privilege of trial by jury for crime does not apply to prevent courts from punishing its officers for contempt, and to regulate them or remove them in particular cases; that removal from office for an indictable offence is no bar to an indictment; that it is a proceeding in its nature civil, and collateral to any criminal prosecution by indictment; and that, even if acquitted by a jury, the party could be removed if the court discovered from the facts proved on the trial that he was guilty of corrupt practices.

In the subsequent case of *Smith* v. *The State*, 1 Yerg. (Tenn.) 228, the charge was that the attorney had accepted a challenge in Tennessee to fight a duel, and had fought with and killed his antagonist in Kentucky, where an indictment had been found against him. He demurred to the charge, and judgment was given against him on the demurrer, that his name be struck from the roll. The Supreme Court of Tennessee held the charge to be sufficient; but that, instead of receiving a demurrer, the Circuit Court should have proceeded to take the proofs to ascertain the truth of the charge. The court, by Catron, J., said: " The principle is almost universal in all governments, that the power which confers an office has also the right to remove the officer for good cause; the county court; constables, &c.; the senate; officers elected by the legislature and people; in all these cases the tribunal removing is of necessity the judge of the law and fact; to ascertain which,

every species of evidence can be heard, legal in its character, according to common-law rules, and consistent with our Constitution and laws. This court, the Circuit Court, or the county court, on a motion to strike an attorney from the rolls, has the same right, growing out of a similar necessity, to examine evidence of the facts, that the senate of the State has when trying an impeachment. . . . The attorney may answer the charges in writing if he chooses, when evidence will be heard to support or to resist them; or, if he does not answer, still the charges must be proved, or confessed by the defendant, before he can be stricken out of the roll." The cause was thereupon remanded to the Circuit Court, to hear the proofs; and it was declared that if the facts were proved as charged, it would be amply sufficient to authorize that court to strike the defendant from the roll, even though there had been no law in Tennessee for the suppression of duelling.

Here, it will be observed, there was no conviction; nothing but an indictment found in another State; and yet the Supreme Court of Tennessee held that the court below might lawfully proceed with the case.

In *Perry* v. *The State*, 3 Greene (Iowa), 550, there were charges of misconduct as an attorney, and of perjury. The charge was dismissed for want of certainty; but as to the charge of false swearing, which it was contended could not be set up without a previous conviction, the court said that a conviction was not necessary.

*In re John Percy*, 36 N. Y. 651, an attorney was struck off the roll on the ground that his general reputation was bad, that he had been several times indicted for perjury, one or two of the indictments being still pending, and that he was a common mover and maintainer of suits on slight and frivolous pretexts. The order was affirmed on appeal. Some of the offences charged in this case were of an indictable character, and one point raised on the appeal was, that the court has no right to call upon an attorney to answer such charges, because it compels him to give evidence against himself. But to this the court answered that he is not compelled to be sworn, but may introduce evidence tending to show his innocence.

In *Penobscot Bar* v. *Kimball*, 64 Me. 140, an attorney was

accused of misconduct, both in his professional character and otherwise, obtáining money by false pretences, and the like. He had also, many years before, been convicted of forgery of a deposition used in court, but had been pardoned. It was held that he was an unfit person to be an attorney, and he was struck from the roll. In this case indictable offences of which the party had not been regularly convicted were embraced in the charges against him.

In *Delano's Case*, 58 N. H. 5, an attorney, being collector of taxes for the town, appropriated the money to his own use, intending to return it; but failing to do so, he was struck from the roll. The offence in this case was clearly of an indictable character, and no conviction had been obtained against him in a criminal proceeding.

In *Matter of George W. Wool*, 36 Mich. 299, a bill in equity having been filed against an attorney charging him with procuring a deed to himself by forgery or substitution of a paper, and a decree having been made against him, the court entered an order to show cause why he should not be struck from the roll, allowing him to present affidavits in exculpation; but no sufficient cause being shown against the rule, it was made absolute. Here was an indictable offence, and no previous conviction; yet the court, upon the evidence it had before it, struck the party's name from the roll.

In *Ex parte Walls*, 64 Ind. 461, the charge was of forging an affidavit to obtain a change of venue in a cause pending in the court. Special proceedings were had under the statute of Indiana, and the party was struck off the roll. On error brought, it was objected that he should have been first regularly convicted of the crime by a prosecution on the part of the state. The court held that this is only true when the object is to inflict punishment, but not when it is to disbar the party, any more than when forgery is proved as a defence in a civil suit; that whilst a conviction would have authorized a disbarment, the proceeding to disbar might precede the criminal prosecution. This case, it is true, was for malpractice as an attorney, and, therefore, may not be strictly in point; but the ground taken by the court was general, and applicable to all cases for which an attorney may be disbarred.

In the recent case of *People* v. *Appleton*, 15 Chicago Legal News, 241, where the charge against an attorney was for disposing of property held by him as a trustee, and appropriating the proceeds to his own use, but was not made out to the satisfaction of the court; it was observed, however, that whilst as a general rule if an attorney is guilty of misconduct in his private character, and not in his official character as attorney, relief can only be obtained by a prosecution in a proper court, at the suit of the party injured, yet that " it is not to be held that there are no exceptions; that there are not cases in which an attorney's misconduct in his private capacity merely, may be of so gross a character that the court will exercise the power of disbarment. There is too much of authority to the contrary to say that."

From this review of the authorities in this country it is apparent, that whilst it may be the general rule that a previous conviction should be had before striking an attorney off the roll for an indictable offence, committed by him when not acting in his character of an attorney, yet that the rule is not an inflexible one. Cases may occur in which such a requirement would result in allowing persons to practise as attorneys, who ought, on every ground of propriety and respect for the administration of the law, to be excluded from such practice. A criminal prosecution may fail by the absence of a witness, or by reason of a flaw in the indictment, or some irregularity in the proceedings; and in such cases, even in England, the proceeding to strike from the roll may be had. But other causes may operate to shield a gross offender from a conviction of crime, however clear and notorious his guilt may be, — a prevailing popular excitement; powerful influences brought to bear on the public mind, or on the mind of the jury; and many other causes which might be suggested; and yet, all the time, the offender may be so covered with guilt, perhaps glorying in it, that it would be a disgrace to the court to be obliged to receive him as one of its officers, clothed with all the prestige of its confidence and authority. It seems to us that the circumstances of the case, and not any iron rule on the subject, must determine whether, and when, it is proper to dispense with a preliminary conviction. If, as Lord Chief Justice

Cockburn said, the evidence is conflicting, and any doubt of the party's guilt exists, no court would assume to proceed summarily, but would leave the case to be determined by a jury. But where the case is clear, and the denial is evasive, there is no fixed rule of law to prevent the court from exercising its authority.

The provisions of the Constitution, which declare that no person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury, and that the trial of all crimes, except in cases of impeachment, shall be by jury, have no relation to the subject in hand. As held by the Supreme Court of Tennessee in *Fields* v. *The State* (and the same view is expressed in other cases), the constitutional privilege of trial by jury for crimes does not apply to prevent the courts from punishing its officers for contempt, or from removing them in proper cases. Removal from office for an indictable offence is no bar to an indictment. The proceeding is in its nature civil, and collateral to any criminal prosecution by indictment. The proceeding is not for the purpose of punishment, but for the purpose of preserving the courts of justice from the official ministration of persons unfit to practise in them. Undoubtedly, the power is one that ought always to be exercised with great caution; and ought never to be exercised except in clear cases of misconduct, which affect the standing and character of the party as an attorney. But when such a case is shown to exist, the courts ought not to hesitate, from sympathy for the individual, to protect themselves from scandal and contempt, and the public from prejudice, by removing grossly improper persons from participation in the administration of the laws. The power to do this is a rightful one; and, when exercised in proper cases, is no violation of any constitutional provision.

It is contended, indeed, that a summary proceeding against an attorney to exclude him from the practice of his profession on account of acts for which he may be indicted and tried by a jury is in violation of the Fifth Amendment of the Constitution, which forbids the depriving of any person of life, liberty, or property without due process of law. But the action of the court in cases within its jurisdiction is due process of law. It

is a regular and lawful method of proceeding, practised from time immemorial. Conceding that an attorney's calling or profession is his property, within the true sense and meaning of the Constitution, it is certain that in many cases, at least, he may be excluded from the pursuit of it by the summary action of the court of which he is an attorney. The extent of the jurisdiction is a subject of fair judicial consideration. That it embraces many cases in which the offence is indictable is established by an overwhelming weight of authority. This being so, the question whether a particular class of cases of misconduct is within its scope, cannot involve any constitutional principle.

It is a mistaken idea that due process of law requires a plenary suit and a trial by jury, in all cases where property or personal rights are involved. The important right of personal liberty is generally determined by a single judge, on a writ of *habeas corpus*, using affidavits or depositions for proofs, where facts are to be established. Assessments for damages and benefits occasioned by public improvements are usually made by commissioners in a summary way. Conflicting claims of creditors, amounting to thousands of dollars, are often settled by the courts on affidavits or depositions alone. And the courts of chancery, bankruptcy, probate, and admiralty administer immense fields of jurisdiction without trial by jury. In all cases, that kind of procedure is due process of law which is suitable and proper to the nature of the case, and sanctioned by the established customs and usages of the courts. " Perhaps no definition," says Judge Cooley, " is more often quoted than that given by Mr. Webster in the Dartmouth College case : ' By the law of the land is most clearly intended the general law ; a law which hears before it condemns ; which proceeds upon inquiry, and renders judgment only after trial. The meaning is that every citizen shall hold his life, liberty, property, and immunities, under the protection of the general rules which govern society.' " Cooley's Const. Lim. 353.

The question, what constitutes due process of law within the meaning of the Constitution, was much considered by this court in *Davidson* v. *New Orleans*, 96 U. S. 97 ; and Mr.

Justice Miller, speaking for the court, said : " It is not possible to hold that a party has, without due process of law, been deprived of his property, when, as regards the issues affecting it, he has, by the laws of the State, a fair trial in a court of justice, according to the modes of proceeding applicable to such a case." And, referring to *Murray's Lessee* v. *Hoboken Land and Improvement Co.*, 18 How. 272, he said : " An exhaustive judicial inquiry into the meaning of the words ' due process of law,' as found in the Fifth Amendment, resulted in the unanimous decision of this court, that they do not necessarily imply a regular proceeding in a court of justice, or after the manner of such courts."

We have seen that, in the present case, due notice was given to the petitioner, and a trial and hearing was had before the court, in the manner in which proceedings against attorneys, when the question is whether they should be struck off the roll, are always conducted.

We think that the court below did not exceed its powers in taking cognizance of the case in a summary way, and that no such irregularity occurred in the proceeding as to require this court to interpose by the writ of *mandamus*. The writ of *mandamus* is, therefore,

* Refused.

Mr. Justice Field dissenting.

I am unable to concur with my associates in their disposition of this case, and I will briefly state the grounds of my dissent.

I appreciate to the fullest extent the indignation of the district judge at the lawless proceedings of the mob in his district in forcibly taking a prisoner from jail and putting him to death. There is no language of reprobation too severe for such conduct; for, however great the offence of the prisoner, the law prescribed its punisment and appointed the officers by whom it was to be executed. The usurpation of their duties, and the infliction of another punishment, were themselves the greatest of crimes, for which the actors should be held amenable to the violated laws of the State.

I join, also, with the learned justice of this court who ex-

presses the views of the majority, in his denunciation of all forms of lawless violence; and I agree with him that the enormity of the offence is increased, when the violence is aided and encouraged by an attorney, bound by his oath of office to uphold the administration of justice in the established tribunals of the country. Nor can the offence be palliated by the statement of counsel, that the fury of the mob had been excited by the attempt of the victim of its violence to outrage the person of a young female.

The question here is, not what indignation may justly be expressed for the alleged offence of the victim, or for that of his assailants; nor what should be done with a person thus guilty of participating in and encouraging the lawless proceedings of the mob: but in what way is his guilt to be determined; when does the law declare him guilty, so that the court may upon such established guilt proceed to inflict punishment for the offence and remove him from the bar.

I do not think that the Circuit Court of the United States could declare the petitioner in this case guilty of a crime against the laws of Florida upon information communicated to its judge on the streets, and thereupon cite him to show cause why he should not be stricken from the roll of attorneys of the court and be disbarred from practising therein.

And though the declaration of the court, upon what was assumed to have been the conduct of the petitioner, contained in the recital of the order directing the citation, be treated, contrary to its language, merely as a charge against him, and not as a judgment upon his conduct, I cannot think that the court had authority to formulate a charge against him of criminal conduct not connected with his professional duties, upon the verbal statements of others, made to its judge outside of the court and without the sanction of an oath. And I cannot admit that upon a charge thus formulated the petitioner could be summarily tried. In no well-ordered system of jurisprudence, by which justice is administered, can a person be tried for a criminal offence by a court, the judge of which is himself the accuser.

The first proceeding disclosed by the record is the following order: —

"CIRCUIT COURT OF THE U. S., SOUTHERN DISTRICT OF FLORIDA,
MARCH TERM, 1882.

" Whereas it has come to the knowledge of this court that one
J. B. Wall, an attorney of this court, did, on the sixth day of this
present month, engage in and with an unlawful, tumultuous, and
riotous gathering, he advising and encouraging thereto, to take
from the jail of Hillsborough County, and hang by the neck until
he was dead, one John, otherwise unknown, thereby showing such
an utter disregard and contempt for the law and its provisions,
which, as a sworn attorney, he was bound to respect and support,
as shows him to be totally unfitted to occupy such position : It is
hereby ordered that said J. B. Wall be cited to appear and show
cause, by eleven o'clock Wednesday, the eighth instant, why his
name should not be stricken from the roll of attorneys, and he be
disbarred and prohibited from practising herein.

"JAMES W. LOCKE,

"TAMPA, FLORIDA, March 7, 1882.                    District Judge."

How these matters came to the knowledge of the court is not
here disclosed, but in the return of the judge to the alternative
writ of *mandamus* from this court we are enlightened on this
point.    He states that on the 6th of March, 1882, on the ad-
journment of the court for dinner, in passing from the court-
house he saw a person brought to the jail by two officers ; that
on his return to the court-house, a little over an hour after-
wards, he saw the dead body of the prisoner hanging from a
tree in front of the court-house door, whereby he became per-
sonally informed of the commission of a most serious offence
against the laws.    He also states that on the same afternoon
" he was informed of the active participation in said crime of
one J. B. Wall, an attorney of said court, by an eye-witness in
whom the most implicit confidence could be placed, but who
declined to make any charge or affidavit of such fact on account
of a fear of said Wall's influence and the local feeling it would
cause against him, the said witness ; that not only from the
direct statements of eye-witnesses, but from numerous other
sources, reliable information of like import was received ;
whereupon said J. B. Wall, the petitioner, was, on the said
seventh day of March, during a session of the Circuit Court of
the United States, in open court, charged in writing by the

respondent herein, as judge, with having, with an unlawful, tumultuous, and riotous gathering, he advising and encouraging thereto, taken from the jail of Hillsborough County, and hanged to a tree by the neck until he was dead, a man to the court known only as John."

Here we have the words of the judge himself, that he acted upon the statements of parties, whose names are not given, nor is their language. His own conclusions as to their import, credibility, and weight are all that is furnished. The statements thus made to him were not evidence before the court for any purpose whatever; and would not justify its action upon any subject over which it has jurisdiction. Suppose that he was called to the stand, and asked why he had made the charge against the petitioner, and what his knowledge was on the subject. He could only have answered, "I can state nothing of my own knowledge; I can merely repeat what others have said to me; they decline to make any charge themselves; they will not confront the accused; but I have implicit confidence in their statements, though they will not verify them by oath." And yet, upon these outside, *ex parte*, unsworn sayings of others, who will not face the accused and whose words are not given, he directs an order to be entered in the Circuit Court reciting — not that the petitioner is charged by others, — not that it appears by the sworn reports of eye-witnesses, — but that "it has come to the knowledge of the court" that the petitioner had engaged in "an unlawful, tumultuous, and riotous gathering, he advising and encouraging" the same, to take a person from the county jail and hang him by the neck until he was dead, thus showing an utter disregard and contempt for the law and its provisions, and himself to be totally unfitted to occupy the position of an attorney of the court.

This is not a charge against the petitioner either in form or language, but a declaration of his guilt in advance of a hearing, founded upon what is termed "knowledge of the court." For this declared guilt he is summoned to show cause why he should not be disbarred. According to the return of the judge, the recital in the order is not correct. No such matter as is there stated ever came, in any legal way, to the knowledge of the court. Information which he gathered in conversation

with others, rumors on the stree's statements communicated outside of the court-room, secret whisperings of men who dare not or will not speak openly and verify their statements, do not constitute such "knowledge of the court" as to make it the basis of judicial proceedings affecting any one's rights. Were not this the case, no man's rights would be safe against the wanton accusation of parties on the streets, whose stories might reach the ear of the judge.

The petitioner appeared upon the citation, and objected to the authority and jurisdiction of the court to issue the rule and require him to answer it, *first*, because the rule did not show that the matters there charged took place in the presence of the court, or were brought to its knowledge by petition or complaint in writing, under oath; and, *second*, because he was charged in the rule with a high crime against the laws of Florida, not cognizable by the court, and for which, if proven, he was liable to indictment and prosecution before the State court.

The petitioner also denied counselling, advising, encouraging, or assisting an unlawful, tumultuous, and riotous gathering, or mob, in taking the person named from the jail of the county and causing his death by hanging, or that he had been guilty of any unprofessional or immoral conduct which showed him to be unfit for the position of an attorney of the court.

The court overruled the objections, and called a witness to prove the participation of the prisoner in the crime alleged. The testimony of this witness, which was reduced to writing, is contained in the record. It is to the effect that he saw the petitioner and others go to the sheriff's house on the 6th of March, and, having heard that a sheriff's *posse* had been summoned to protect the jail, he thought, by their orderly manner, that they were the *posse* going for instructions; that when they came out he heard one of the party remark, "We have got all of you we want;" that he then thought something was wrong, and followed them, and saw them coming out of the jail with the prisoner; that the petitioner was with the prisoner, walked beside him, and, witness *thinks*, had hold of him until they crossed the fence, that after that he did not see the petitioner any more until the matter was all over. The witness further

testified that he could not name any man in the crowd, which numbered over a hundred, except the sheriff; that he was excited and did not notice who they were. He did not see the petitioner leave the crowd, though he might have done so without the witness seeing him. Upon this uncertain, insufficient, and inconclusive testimony, which does not show a participation of the petitioner in " advising and encouraging " the lawless proceedings, and is consistent with his opposition to them, the judge was entirely satisfied. His language on the subject is:

" That the evidence, although of but a single witness, for grounds already stated, was to your respondent positively conclusive beyond a reasonable doubt that said J. B. Wall had been guilty of active participation in a most immoral and criminal act, and a leader in a most atrocious murder, in defiance and contempt of all law and justice, and thereby shown himself unfitted to longer retain the position of an attorney in any court over which your respondent might have the honor to preside."

Nothing could more plainly illustrate the wisdom of the rule that the accuser should not be the judge of the accusation. The judge very naturally felt great indignation at the lawless proceedings of the mob in hanging the prisoner, and, as he states, had heard reports inculpating the petitioner as a participant therein. His indignation, whether arising from such reported participation or otherwise, must have possessed him when he had the petitioner before him, for nothing else can explain the extraordinary conclusion he reached upon the testimony taken. That testimony shows merely a mingling of the petitioner with the crowd engaged in the unlawful purpose; it does not necessarily show his participation in the execution of that purpose. There was no evidence that he encouraged the proceedings. There was no evidence as to what he did say to the crowd. He may have advised against their action. The witness said nothing on the subject, nor did he see the petitioner after the crowd reached the fence. The petitioner was not seen at the execution, nor is there any evidence that he was present; and yet, the vague testimony of this excited witness, as to matters entirely consistent with innocence, is held by the judge " to be positively conclusive

beyond a reasonable doubt" that the petitioner was guilty of active participation in a criminal act and " a leader in a most atrocious murder."

There are some other things also in the return of the judge which are outside of the record of proceedings in the Circuit Court, and inconsistent with them, as that the petitioner demanded that proof should be made of the matter charged. His main position was that the court had no jurisdiction to require him to answer at all, because charged in the rule with a crime against the laws of Florida, not cognizable in that court, and for which, if proven, he was liable to indictment and conviction in the State court, — a position inconsistent with a demand of proof of the charge.

Objection is taken here — though not taken in the court below — to the form of the petitioner's denial to what is termed the charge of the judge, it being called by my brethren a negative pregnant. This is, indeed, a singular objection, in view of the fact that there was, in truth, as already said, no *formal* charge against the petitioner. The court assumed, and declared that it had come to its knowledge, that he was guilty of a public offence which unfitted him to be an attorney, and called upon him to show cause why he should not be disbarred for it. If the court had such knowledge a denial by him was useless, and the taking of testimony on the subject an idle proceeding. He might have replied to the judge who constituted the court : " Who made you a judge to affirm my guilt, in advance of hearing, upon street rumors? I decline to answer you at all, you having thus prejudged and condemned me." With what propriety could the court have then proceeded? What legal reason could it have given for its action? I am unable to perceive that it could have given any.

Treating, however, the preannounced judgment of the court as a charge, the answer of the petitioner might have been more general than it was. It was sufficiently specific to meet all the rules of pleading in criminal cases; and I do not think that the nicety exacted in an answer to a bill of discovery in a chancery suit was required. It was enough that the answer was a denial of the offence alleged, and could in no way be tortured into any admission of guilt.

But apart from the consideration of the form of the petitioner's answer, or the weight to be given to the evidence of the excited witness, I cannot assent to the doctrine that, by virtue of any power which a court possesses over attorneys, it can try one for a felony upon a proceeding to disbar him. The Constitution of the United States and of every State has made it a part of the fundamental law of the land that " no person shall be held to answer for a capital or otherwise infamous crime unless on a presentment or indictment of a grand jury," except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger. A felony is an infamous crime. No person charged therewith can be held *to answer* therefor ; that is, can, in any other form of proceeding, be required to explain his conduct or vindicate his action. This provision excludes an inquiry, and, of course, any possible punishment for an imputed crime, except upon a conviction under such presentment or indictment. If a party is otherwise tried and punished, the constitutional guaranty is violated in his person.

If one court can, upon information communicated to its judge, in any other than a legal way, that a public offence has been committed by an attorney, call upon him to show satisfactorily that the charge is unfounded or be disbarred, so may all courts which have the power to admit attorneys, and, of course, this court. And what a spectacle would be presented if, upon reports like those in this case, or even upon written charges, that attorneys in different parts of the country have committed murder, burglary, forgery, larceny, embezzlement, or some other public offence, they could be cited here to answer summarily as to such charges without being confronted by their accusers, without previous indictment, without trial by jury, and, of course, without the benefit of the presumptions of innocence which accompany every one until legally convicted. With what curious and wondering eyes would such proceedings be watched, when A. should be summoned from one part of the country on a charge of murder, B. from another part of the country on a charge of burglary, C. from another part on a charge of larceny, D. from still another on a charge of having violated his marriage vows, and others on charges embracing

different felonies! Such proceedings would be scandalous, and would shock every one who regards with favor the guarantees of personal rights in the Constitution. They would not and ought not to be tolerated by the country; and yet how would they differ from the case before us? It is no excuse to say that the punishment inflicted upon the petitioner is not that prescribed by the law for the public offence charged, and that it is only the latter which requires previous presentment or indictment. The Constitution declares that "no person shall be held to answer" for any infamous offence, that is, to explain and justify his conduct upon such a charge, except when made by the presentment or indictment of a grand jury, without reference to the punishment that may follow on its being established. That instrument looks to the substance of things, and not to mere forms. Its purpose is to protect every one against wanton complaints of the commission of a public offence. It therefore confides the power of accusation for such an offence to a specially constituted body; and interdicts all trial, and, of course, all punishment, except upon its formal presentation. This interdict would be of little protection if it could be evaded by a mere change in the extent or nature of the punishment.

In the test oath case from Missouri we have an illustration of an attempt to evade a constitutional inhibition, and of its futility. That State had in 1865 adopted a new constitution, which prescribed an oath to be taken by persons filling certain offices and trusts and pursuing various vocations within its limits. They were required to deny that they had done certain things, or by act or word had manifested certain desires and sympathies. The oath, divided into its separate parts, embraced thirty distinct affirmations respecting the past conduct of the affiant, extending even to his words, desires, and sympathies.

Every person unable to take this oath was declared by the Constitution incapable of holding in the State "any office of honor, trust, or profit under its authority, or of being an officer, councilman, director or trustee, or other manager of any corporation, public or private, now existing or hereafter established by its authority, or of acting as a professor or teacher in any educational institution, or in any common or other school, or of

holding any real estate or other property in trust for the use of any church, religious society, or congregation."

And every person, at the time the Constitution took effect, holding any of the offices, trusts, or positions mentioned, was required, within sixty days thereafter, to take the oath ; and, if he failed to comply with this requirement, it was declared that his office, trust, or position should *ipso facto* become vacant.

No person, after the expiration of the sixty days, was permitted, without taking the oath, " to practise as an attorney or counsellor-at-law," nor after that period could " any person be competent, as a bishop, priest, deacon, minister, elder, or other clergyman, of any religious persuasion, sect, or denomination, to teach, or preach, or solemnize marriages."

Fine and imprisonment were prescribed as a punishment for holding or exercising any of " the offices, positions, trusts, professions, or functions " specified, without having taken the oath ; and false swearing or affirmation in taking it was declared to be perjury, punishable by imprisonment in the penitentiary.

A priest of the Roman Catholic Church was indicted in a Circuit Court of Missouri and convicted of the crime of teaching and preaching as a priest and minister of that religious denomination, without having first taken the oath, and was sentenced to pay a fine of $500, and to be committed to jail until the same was paid. On appeal to the Supreme Court of the State the judgment was affirmed, and the case was brought on error to this court. It was plain that if the power existed in the State to exact from parties this oath respecting their past conduct, desires, and sympathies, as a condition of their being permitted to continue in their vocations, or to hold certain trusts, it might be used, and, on occasions of excitement to which all communities are subject, would be used to their oppression and even ruin. The State might require such oath for any period of their past lives, might call upon them to affirm whether they had observed the Ten Commandments, or had discharged any particular civil or moral duty, or had entertained any particular sentiments, or desires, or sympathies, as a condition of their being allowed to engage in one of the ordinary pursuits of life, in a profession, trade, or business. It might impose conditions which individuals and whole classes in

the community would be unable to comply with, and thus deprive them of civil and political rights.. Under this form of legislation no oppression can be named which might not have been effected.

A large portion of the people of Missouri were unable to take the oath. It was, therefore, contended that the clauses of its Constitution which required priests and clergymen to take and subscribe the oath as a condition of their being allowed to continue in the exercise of their professions, and preach and teach, operated upon those who could not take it as a bill of attainder within the meaning of the provision of the Federal Constitution prohibiting the States from passing bills of that character. With respect to them the clauses amounted to a legislative deprivation of their rights.

It was also contended that in thus depriving priests and clergymen of the right to preach and teach, the clauses imposed a penalty for some acts which were innocent at the time they were committed, and increased the penalty for other acts which at the time constituted public offences, and in both particulars violated the provision of the Federal Constitution prohibiting the passage by the States of an *ex post facto* law.

On the other hand, it was contended that the provisions of the Constitution of Missouri exacting the oath mentioned, merely prescribed conditions upon which members of the political body might exercise their various callings; that bills of pains and penalties, which are included under the head of bills of attainder, and *ex post facto* laws, are such as relate exclusively to crimes and their punishments; that they are in terms acts defining and punishing crimes and designating the persons to be affected by them, and do not bear any resemblance to the provisions of the Constitution of Missouri.

There was much force in the objections thus urged to the position that the clauses in the Missouri Constitution constituted a bill of attainder and an *ex post facto* law; and had the court looked to the form rather than to the substance of things, they must have prevailed. But the court did not thus limit its view. It regarded the constitutional guarantees as applying wherever private rights were to be protected against legislative deprivation, whatever the form of the legislation. And

it could not perceive any substantial difference between legislation imposing upon parties impossible conditions as to past conduct for the enjoyment of existing rights, and legislation in terms depriving them of such rights, or imposing as a punishment for past conduct the forfeiture of those rights. It therefore adjudged the clauses of the Missouri Constitution in question to be invalid on both grounds urged, as a bill of attainder and an *ex post facto* law. They accomplished precisely what the most formal enactments of that nature would have done, and were, therefore, in like manner prohibited. " The legal result," said the court, " must be the same, for what cannot be done directly cannot be done indirectly. The Constitution deals with substance, not shadows. Its inhibition was levelled at the thing, not the name. It intended that the rights of the citizen should be secure against deprivation for past conduct by legislative enactment, under any form, however disguised. If the inhibition can be evaded by the form of the enactment, its insertion in the fundamental law was a vain and futile proceeding."

I have been thus particular in the statement of the Cummings case, for it seems to me that the rule of construction there applied should be extended so as to protect the citizen from answering in any form, or being punished in any way, for an infamous offence, except, as the Constitution prescribes, on a presentment or indictment of a grand jury. Here, under the form of a civil proceeding, a party is summoned to answer, and is punished for an alleged criminal offence, to try which the Circuit Court has confessedly no jurisdiction, and which is in no way connected with his professional conduct. The protection of the Constitution should not be thus lost, though the punishment be not one prescribed by statute, but one resting in the discretion of the court. I know, of course, that this court has, with the exception of two of its members, been entirely changed in its *personnel* since the Cummings case was decided. I am the only living member of the majority of the court which, sixteen years ago, gave that judgment. I would fain hope, however, that this change may not lead to a change in the construction of clauses in the Constitution intended for the protection of personal rights, even though its present mem-

bers, if then judges, might not have assented to the decision, and however much they may be disposed to follow their own peculiar views where rights of property only are involved. I am of opinion that all the guarantees of the Constitution designed to secure private rights, whether of person or property, should be broadly and liberally interpreted so as to meet and protect against every form of oppression at which they were aimed, however disguised and in whatever shape presented. They ought not to be emasculated and their protective force and energy frittered away and lost by a construction which will leave only the dead letter for our regard when the living spirit is gone.

What, then, are the relations between attorneys and counsellors-at-law and the courts; and what is the power which the latter possess over them; and under what circumstances can they be disbarred? There is much vagueness of thought on this subject in discussions of counsel and in opinions of courts. Doctrines are sometimes advanced upholding the most arbitrary power in the courts, utterly inconsistent with any manly independence of the bar. The books, unfortunately, contain numerous instances where, for slight offences, parties have been subjected to oppressive fines, or deprived of their offices, and, consequently, of their means of livelihood, in the most arbitrary and tyrannical manner. The power to punish for contempt — a power necessarily incident to all courts for the preservation of order and decorum in their presence — was formerly so often abused for the purpose of gratifying personal dislikes, as to cause general complaint, and lead to legislation defining the power and designating the cases in which it might be exercised. The act of Congress of March 2, 1831, c. 99, limits the power of the courts of the United States in this respect to three classes of cases: *first*, where there has been misbehavior of a person in the presence of the court or so near thereto as to obstruct the administration of justice; *second*, where there has been misbehavior of any officer of the court in his official transactions; and, *third*, where there has been disobedience or resistance by any officer, party, juror, witness, or other person to any lawful writ, process, order, rule, decree, or command of the court. The power, as thus seen, — so far as

the punishment of contempts is concerned, — can only be exercised by the courts of the United States to insure order and decorum in their presence; faithfulness on the part of their officers in their official transactions; and obedience to their lawful orders, judgments, and process.  *Ex parte Robinson*, 19 Wall. 505.

The power to disbar attorneys in proper cases, though not, perhaps, affected by this law, is not to be exercised arbitrarily or tyrannically.  Under our institutions arbitrary power over another's lawful pursuits is not vested in any man nor in any tribunal.  It is odious wherever exhibited, and nowhere does it appear more so than when exercised by a judicial officer toward a member of the bar practising before him.

Attorneys and counsellors-at-law — and the two characters are in this country generally united in the same person — are officers of the court, admitted to be such by its order upon evidence that they possess sufficient learning to advise as to the legal rights of parties, and to conduct proceedings in the courts for their prosecution or defence, and that they have such fair private characters as to insure fidelity to the interests intrusted to their care.  The order of admission, as said in the Garland case, is the judgment of the court that they possess the requisite qualifications of learning and character, and are entitled to appear as attorneys and counsellors and to conduct causes therein.  Thenceforth they are responsible to the court for professional misconduct and entitled to hold their offices during good behavior.  4 Wall. 333, 387.

Their office, as was also said in the same case, is not held as a matter of grace and favor.  The right which it confers is something more than a mere license, revocable at the pleasure of the court.  It is a right of which they can be deprived only by its judgment for moral or professional delinquency.

The oath which every attorney and counsellor is required to take on his admission briefly expresses his duties.  It is substantially this: that he will support the Constitution of the United States, and " conduct himself as an attorney and counsellor of the court uprightly and according to law."  This implies not only obedience to the Constitution and laws, but that he will, to the best of his ability, advise his clients as to their

legal rights, and will discharge with scrupulous fidelity the duties intrusted to him; that he will at all times maintain the respect due to the courts and judicial officers; that he will conform to the rules prescribed by them for his conduct in the management of causes; that he will never attempt to mislead them by artifice or any false statement of fact or intentional misstatement of the law, and will never employ any means for the advancement of the causes confided to him except such as are consistent with truth and honor. So long as he carries out these requirements of his oath he will come within the rule of "good behavior," and no complaint of his professional standing can be made. The authority which the court holds over him and the exercise of his profession extends so far, and so far only, as to insure a compliance with these requirements. It is for a disregard of them, therefore, that is, for professional delinquency, and the loss of character for integrity and trustworthiness, or, in other words, for moral delinquency, which a disregard of them manifests, that the court will summarily act upon his office and disbar him. In other words, the summary jurisdiction of the court in this respect will only be exercised: *first*, for misconduct of the attorney in cases and matters in which he has been employed or consulted professionally, or matters in which, from their nature, it must be presumed he was employed by reason of his professional character; and, *second*, for such misconduct outside of his profession as shows the want of that integrity and trustworthiness which is essential to insure fidelity to interests intrusted to him professionally. The commission of a felony or a misdemeanor involving moral turpitude is of itself the strongest proof of such misconduct as will justify an expulsion from the bar; but the only evidence which the court can receive of the commission of the offence, when it is not admitted by the party, is a record of his conviction. Of this I shall presently speak.

When the charge against the attorney is of misconduct in his office, and that involves, as it sometimes may, the commission of a public offence, for which he may be prosecuted criminally, the inquiry should proceed only so far as to determine the question of professional delinquency, and he should be left to the proper tribunals for the punishment of the crime com-

mitted.  And on such an inquiry no answer will be required of
him which would tend to his crimination.  Thus, to illustrate,
if he has collected money for his, client, and has not paid it
over, the court, upon appropriate complaint, will order him to
be cited to show cause why he should not pay it.  If, upon the
citation, a sufficient reason is not given for the retention of the
money, the court will enter an order directing him to pay it
immediately or by a day designated.  Should he still refuse,
he may then be disbarred for disobedience to the order and
for the professional delinquency thereby involved; but for the
offence of embezzlement or other crime, committed in the re-
tention of the money, he will be turned over to the criminal
courts.  Or, take the case suggested on the argument: should
an attorney, in the course of a trial, get into a personal colli-
sion with the opposing counsel or with a witness, and assault
him with a deadly weapon, or kill him, the court would un-
doubtedly require the offender to show cause why he should
not be expelled from the bar for the violence, disturbance, and
breach of the peace committed in its presence.  It would be
sufficient to justify expulsion that he had so far forgotten the
proprieties of the place and the respect due to the court as to
engage in a violent assault in its presence.  But for the trial
of the offence of committing a deadly assault, or for the homi-
cide, he would be turned over to the criminal courts.  Or, take
another case mentioned on the argument, where an attorney
has presented a false affidavit, or represented as genuine a fic-
titious paper.  The use of such documents, knowing their char-
acter, is a fraud upon the court, an attempt to deceive it, and
constitutes such professional misconduct as to justify the im-
position of a heavy fine upon him or his temporary suspension
or expulsion from the bar, without reference to the materiality
of the contents of the false affidavit or of the fictitious paper;
but for the crimes involved in their use he should be sent to
the proper tribunals, because he cannot be tried therefor, on a
motion to punish him for a contempt or to disbar him.

It is because of this limitation upon the extent of judicial
inquiry into such matters that a proceeding for purely profes-
sional misconduct against an attorney may be taken in any
way which will sufficiently apprise him of the grounds upon

which it is founded, and afford him an opportunity to be heard. It is not as thus limited a criminal proceeding in any proper sense, requiring full and formal allegations with the precision of an indictment. As said in *Randall* v. *Brigham*, where a letter of a party defrauded, laid before a grand jury and communicated by its direction to the court, was the foundation of proceedings against an attorney: " Such proceedings are often instituted upon information developed in the progress of a cause, or from what the court learns of the conduct of the attorney from its own observation. Sometimes they are moved by third parties upon affidavit; and sometimes they are taken by the court upon its own motion. All that is requisite to their validity is that when not taken for matters occurring in open court, in the presence of the judges, notice shall be given to the attorney of the charges made, and opportunity afforded him for explanation and defence. The manner in which the proceeding shall be conducted, so that it be without oppression or unfairness, is a matter of judicial regulation." 7 Wall. 523, 540. The objection here is that this recognized limitation upon judicial inquiry in such cases is exceeded, and the civil proceeding is made the means of inflicting punishment for a criminal offence in no way connected with the party's professional conduct.

When the proceeding to disbar an attorney is taken for misconduct outside of his profession, the inquiry should be confined to such matters, not constituting indictable offences, as may show him unfit to be a member of the bar; that is, as not possessing that integrity and trustworthiness which will insure fidelity to the interests intrusted to him professionally, and to the inspection of any record of conviction against him for a felony or a misdemeanor involving moral turpitude. It is not for every moral offence which may leave a stain upon character that courts can summon an attorney to account. Many persons, eminent at the bar, have been chargeable with moral delinquencies which were justly a cause of reproach to them; some have been frequenters of the gaming-table, some have been dissolute in their habits, some have been indifferent to their pecuniary obligations, some have wasted estates in riotous living, some have been engaged in broils and quarrels disturb-

ing the public peace; but for none of these things could the
court interfere and summon the attorney to answer, and if his
conduct should not be satisfactorily explained, proceed to dis-
bar him.   It is only for that moral delinquency which consists
in a want of integrity and trustworthiness, and renders him an
unsafe person to manage the legal business of others, that the
courts can interfere and summon him before them.   He is dis-
barred in such case for the protection both of the court and
of the public.

A conviction of a felony or a misdemeanor involving moral
turpitude implies the absence of qualities which fit one for an
office of trust, where the rights and property of others are con-
cerned.   The record of conviction is conclusive evidence on
this point.   Such conviction, as already said, can follow only
a regular trial upon the presentment or indictment of a grand
jury.   It cannot follow from any proceeding of the court on a
motion to disbar, for the reason already given, that no one can
be required to answer for such an offence except in one way.
If a party indicted is, upon trial, acquitted, the court cannot
proceed to retry him for the offence upon such a motion.   He
may answer, after acquittal, that he never committed the of-
fence, and that no tribunal can take any legal proceeding
against him on the assumption that he had been wrongfully
acquitted.   And what the court cannot do after acquittal it
cannot do by such a proceeding before trial.   If the court,
after acquittal, can still proceed for the alleged offence, as a
majority of my brethren declare it may, and call upon him to
show that he is not guilty or be disbarred, there is a defect
in our Constitution and laws which has, up to this day, re-
mained undiscovered.   Hitherto it has always been supposed
that the record of acquittal of a public offence, after a trial by
a jury, was conclusive evidence, at all times and in all places,
of the party's innocence.   This doctrine, until to-day, has been
supposed to be immovably embedded in our jurisprudence.

There are many cases in the books where the view I have
taken of the authority of the court over attorneys and coun-
sellors-at-law is recognized and acted upon.   In a case in the
Supreme Court of New Jersey, 2 Hals. (N. J.) 162, reported
without a name out of respect to the friends of the party im-

plicated, an application was made on behalf of members of the bar for a rule that a certain attorney show cause why his name should not be stricken from the rolls, upon an allegation that he had been guilty of larceny. The moving party stated in his application that it was a matter of notoriety that the attorney had purloined books, to a considerable amount, from persons who were at the time in court and ready, when called upon, to substantiate the charge. The counsel, therefore, on behalf of members of the bar, called upon the court to relieve them from the reproach of having the man attached to their profession, and from the disgrace of being compelled, in their professional duties, to have intercourse with one with whom they would be ashamed to associate in private life; and that the court had undoubtedly the power to grant the rule, for, as it was essential to the admission of an attorney that he should be of good moral character, it must be equally essential that he should continue to be such. But the Chief Justice said: "The offence of which it is alleged this man has been guilty is neither a contempt of court nor does it fall within the denomination of malpractice. It would appear to me, therefore, that he must be first convicted of the crime by a jury of his countrymen before we can proceed against him for such an offence; for, suppose he should be brought to the bar and should say he was not guilty, we could not try the fact."

The case was then taken under advisement, and at a subsequent day the court said, speaking by the Chief Justice: "We have reflected upon this case, and do not see how we can do anything in it, because the court seems to be confined to cases of malpractice or to crimes which are in the nature of *crimen falsi*, and of which there has been a conviction." Justice Ford, of the court, added: "An attorney may be struck off the roll, *first*, for a breach of the rules of the court; *second*, for breach of any of his official duties; *third*, for all such crimes and misdemeanors as affect his moral character. But in this third class of cases we cannot proceed in the ordinary way; there ought always to be a previous conviction before this court can interfere. All the cases cited sanction this distinction, except the case from the District of Columbia, which is anomalous." The rule was, therefore, refused.

In *Ex parte Steinman and Hensel*, 95 Pa. St. 220, the parties, members of the bar of Lancaster County, in Pennsylvania, were editors of a newspaper published in the county. In one of its numbers an article appeared which charged that the judge of the Court of Quarter Sessions of the county had decided a case wrongfully from motives of political partisanship. The court thereupon sent for the parties, and on their appearance they admitted that they were editors of the paper and that as such they were responsible for the publication. The court then entered a rule upon them to show cause why they should not be disbarred and their names stricken from the roll of attorneys for misbehavior in their offices. To this rule they answered, setting up, among other things, that if the charge was that they had published a libellous article, it was that they had committed an indictable offence, not in the presence of the court, or while acting as its officers, and therefore could not be called upon to answer the rule until they should have been tried and convicted, according to law, for the offence; and that the court was not competent to determine in that form of proceeding that they did unlawfully and maliciously publish, out of court, a libel upon the court, and to hear and determine disputed questions of fact involving the motives of the parties and the official conduct of the court. The rule, however, was made absolute, and the names of the parties were ordered to be stricken from the roll of attorneys. They then took the case on writ of error to the Supreme Court of the State, where the judgment was reversed, and it was ordered that the parties be restored to the bar. Chief Justice Sharswood, in delivering the opinion of the court, said: —

"No question can be made of the power of a court to strike a member of the bar from the roll for official misconduct in or out of court. By the seventy-third section of the act of April 14, 1834, it is expressly enacted that 'if any attorney-at-law shall misbehave himself in his office of attorney he shall be liable to suspension, removal from office, or to such other penalties as have heretofore been allowed in such cases by the laws of this Commonwealth.' We do not mean to say — for the case does not call for such an opinion — that there may not be cases of misconduct not strictly professional which would clearly

show a person not to be fit to be an attorney, nor fit to asso-
ciate with honest men. Thus, if he was proved to be a thief,
a forger, a perjurer or guilty of other offences of the *crimen
falsi*. But no one, we suppose, will contend that for such an
offence he can be summarily convicted and disbarred by the
court without a formal indictment, trial, and conviction by a
jury, or upon confession in open court. Whether a libel is an
offence of such a character may be a question, but certain it is
that if the libel in this case had been upon a private individual,
or upon a public officer, such even as the district attorney, the
court could not have summarily convicted the defendants and
disbarred them." p. 237.

A similar doctrine obtains in the courts of England. Thus,
in a case in 5 Barn. & Adol. 1088, the Solicitor-General of
England moved the Court of King's Bench for a rule calling on
two attorneys of the court to show cause why they should not
be struck off the roll, on affidavits charging them with profes-
sional misconduct in certain pecuniary transactions. Lord
Denman, the Chief Justice, replied: " The facts stated amount
to an indictable offence. Is it not more satisfactory that the
case should go to a trial? I have known applications of this
kind, after conviction, upon charges involving professional mis-
conduct; but we should be cautious of putting parties in a sit-
uation where, by answering, they might furnish a case against
themselves, on an indictment to be afterwards preferred. On
an application calling upon an attorney to answer the matters
of an affidavit, it is not usual to grant the rule if an indictable
offence is charged." The court, however, desired the Solicitor-
General to see if any precedent could be found of such an
application having been granted. The Solicitor-General after-
wards stated that he had been unable to find any, and the rule
was discharged. My brethren are mistaken in supposing that
in this case the attorneys were required to answer under oath
the charges made.

*In re* ——, 3 Nev. & P. 389, a motion was made to the Court
of Queen's Bench to strike an attorney off the roll on an
affidavit alleging a distinct case of perjury by him. The at-
torney had sworn to the sum of £374 as the expenses of wit-
nesses, which was reduced before the master to £47. It was

contended that the court could exercise its summary jurisdiction on the ground of the perjury. But the Chief Justice replied: "Would not an indictment for perjury lie upon these facts? We are not in the habit of interposing in such a case, unless there is something amounting to an admission on the part of the attorney which would render the interposition of a jury unnecessary." The moving counsel answered that there was enough in the affidavit to show a distinct case of perjury, but that there was no admission. The rule was, therefore, refused.

To the same purport are numerous other adjudications, and their force is not weakened by the circumstance that it is also held that it is no objection to the exercise of the summary jurisdiction of the court that the conduct constituting the delinquency, for which disbarment is moved, may subject the party to indictment. When such is the case he is not required to answer the affidavits charging the official delinquency, for no one can be compelled to criminate himself, and the court confines its inquiry strictly to such acts as are inconsistent with the attorney's duty in his profession. It looks only to the professional conduct of the attorney, and acts upon that.

In *Stephens* v. *Hill*, which was before the Court of Exchequer, a distinction was drawn between the misconduct of an attorney outside of a proceeding in court which might subject him to an indictment, and such misconduct committed by him in a proceeding in court. For the former no motion to disbar would be entertained; for the latter the motion would be heard. There an attorney for the defendants had persuaded a material witness for the plaintiff to absent himself from the trial of the cause, and had undertaken to indemnify him for any damage he might sustain for so doing. Upon affidavits disclosing this matter, application was made to disbar the attorney. It was objected that the court would not exercise its summary jurisdiction when the misconduct charged amounts to an indictable offence, as was the conspiracy in which the attorney was engaged. But the Chief Baron, Lord Abinger, answered that he never understood that an attorney might not be struck off the roll for misconduct in *a cause in which he was an attorney* merely because the offence imputed to him was of

such a nature that he might have been indicted for it; that so long as he had been in Westminster Hall he had never heard of such a rule, though the court would not require the attorney to answer the affidavits. "If, indeed," said the Chief Baron, speaking for the court, "a case should occur where an attorney has been guilty of some professional misconduct, for which the court by its summary jurisdiction might compel him to do justice, and at the same time has been guilty of something indictable in itself, but not arising out of the cause, the court would not inquire into that with a view of striking him off the roll, but would leave the party aggrieved to his remedy by a criminal prosecution." And, again, "Where, indeed, the attorney is indicted for some matter not connected with the practice of his profession of an attorney, that also is a ground for striking him off the roll, although in that case it cannot be done until after conviction by a jury." 10 Mee. & W. 28, 32, 33. The conduct of the attorney in that case tended to defeat the administration of justice, and was grossly dishonorable. He had employed for the success of his cause means inconsistent with truth and honor. He was, therefore, rightly disbarred without reference to his liability to a criminal prosecution for his conduct.

There is no case I have been able to find, after a somewhat extended examination of the reports, where, for an indictable offence, wholly distinct from the attorney's professional conduct, the commission of which was not admitted, he has been compelled, in advance of trial and conviction, to show cause why he should not be disbarred, except one in Tennessee for accepting a challenge to fight a duel and killing his antagonist. *Smith* v. *The State*, 1 Yerg. (Tenn.) 228. This case is exceptional, and finds no support in the decisions of the courts of other States. There is no case at all like the one at bar to be found in the reports of the courts of England or of any of the States of the Union.

In the numerous cases cited in the opinion of my brethren, the matter which was the subject of complaint, and the ground of the action of the court, related to the conduct of the party in his professional business or in business connected with or growing out of his profession. Thus, the advertisement of an

attorney that he could procure divorces for causes not known to the law, without publicity, or reference to the parties' residence; colluding with a wife to manufacture evidence to procure a divorce; the misapplication by him of funds collected; his bribery of witnesses, hiring them to keep out of the way, or to disregard a subpœna; his falsely personating another in legal proceedings; instituting suits without authority; knowingly taking insufficient security; forging an affidavit to change a venue; substituting the name of his client for his own in an affidavit to procure alimony; altering a letter to a judge in order to secure the allowance of bail; attempting to make an opposing attorney drunk, in order to obtain an advantage of him on the trial of a cause; obtaining money from a client by false representations respecting the latter's title to lands, and advances for taxes; and many other like matters, which operated as a fraud upon the court and tended to deceive it, and were inconsistent with professional honor and integrity, were very properly considered as sufficient grounds for temporary suspension or absolute expulsion from the bar. And in this class of cases we sometimes find objections were taken that the offences charged subjected the attorney to liability for indictment, and for that reason should not be considered; and it was in answer to such objections that language was used which apparently conflicts with the views I have expressed, but not really so when read in connection with the facts. In those cases the conduct of the attorney, even when furnishing ground for indictment, was, independently of its criminal character, open to consideration on a motion to disbar, so far as it affected him professionally; and so it was said that it was no objection to such consideration that he might have been also indicted for the offence committed, — language which can have no application where the offence, as in this case, had no connection with the party's professional conduct.

In illustration of this statement I will make a brief reference to some of the cases cited by my brethren and upon which they seem chiefly to rely. That of *Stephens* v. *Hill*, in the Court of Exchequer, already explained, confirms what I have said. There, while holding that the fact that the matter complained of might subject the attorney to an indictment would

not prevent an inquiry into it, so far as it affected his professional conduct, Lord Abinger takes particular pains to say, as appears from the quotation from his opinion which I have given, that where the matter is not connected with the practice of the attorney's profession, though it might be ground for striking him from the roll, " in that case it cannot be done until after conviction by a jury."

In *Re Blake*, 3 El. & El. 34, the court held that its summary jurisdiction over its attorneys is not limited to cases in which they have been guilty of misconduct, such as amounts to an indictable offence, or arises in the ordinary course of their professional practice, but extends to all cases of gross misconduct on their part, in any matter in which they may, from its nature, be fairly presumed to have been employed in consequence of their professional character. In that case money had been lent to an attorney, previously known and employed as such, upon his note, and a deed of assignment of a mortgage on an estate in Ireland, by which a greater amount was secured to him. The estate getting into the Irish Encumbered Estates Court, the attorney borrowed the deed from his creditor for the purpose, as alleged, of supporting his claim in that court, but in reality in order to obtain the payment of the amount secured to him. Having established his right to that payment, he returned the deed to the creditor, and afterwards received the whole amount secured and appropriated it to his own use. It is with reference to these facts that Chief Justice Cockburn uses the language quoted by my brethren. He said that although Blake applied to the lender in the first instance, as an attorney, he thought the transaction had ultimately resolved itself into a mere loan between them as individuals. But the transaction had evidently grown out of their former relation as attorney and client. Mr. Justice Crompton, in concurring with the Chief Justice, said: " In the present case, I cannot say that Blake's fraud was not committed in a matter connected with his professional character. If he did not act in it as an attorney, he at all events took advantage of his professional position to deceive Beevirs " (the lender).

In *Re Hill*, Law Rep. 3 Q. B. 543, an attorney, acting as a

clerk to a firm of attorneys, in completing the sale of certain property, received the balance of the purchase-money and appropriated it to his own use. On affidavits stating the facts, a motion was made to strike him off the rolls. He admitted the misappropriation, and was accordingly suspended for twelve months. Said Chief Justice Cockburn: "In this case, if the delinquent had been proceeded against criminally upon the facts admitted by him, it is plain that he would have been convicted of embezzlement, and upon that conviction being brought before us, we should have been bound to act. If there had been a conflict of evidence upon the affidavits, that might be a very sufficient reason why the court should not interfere until the conviction had taken place; but here we have the person against whom the application is made admitting the facts." It is difficult to see the pertinency of this decision to the position taken by my brethren. These two cases are, in the language used, the strongest to be found in the reports on that side; but their facts give it no strength whatever.

In *Penobscot Bar* v. *Kimball*, 64 Me. 140, the attorney had been convicted of forging a deposition used by him in a suit against his wife for a divorce; and though pardoned for the crime, the fraud upon the court remained, and for that and for other disreputable practices and professional misconduct, rendering him " unfit and unsafe to be intrusted with the powers, duties, and responsibilities of the legal profession," he was disbarred.

In *Delano's Case*, 58 N. H. 5, where an attorney was disbarred by the Supreme Court of New Hampshire for wrongfully appropriating to his own use money of a town received by him as a collector of taxes, the commission of the offence was admitted. This is evident from the statement of the court in its opinion that " he and his wife and family did what they could to make good the loss to the town, but with only partial success."

In *Perry* v. *The State*, 3 Greene (Iowa), 550, the false swearing charged as one of the grounds of complaint against the attorney was committed in a cause managed by him, in which he voluntarily appeared as a witness, thus practising a

fraud upon the court by employing to sustain his cause means inconsistent with truth and honor.

In *Ex parte Walls*, 64 Ind. 461, the attorney had forged an affidavit to obtain a change of venue, and had thus grossly imposed upon the court. For this imposition, independently of the crime committed, he was properly disbarred.

In *Ex parte Burr*, 2 Cranch C. C. 379, the charges against the attorney were for malpractice in his profession, in advising a person in jail, who was either a recognized witness or a defendant for whom some person was special bail, to run away; instituting suits against parties, and appearing for parties without authority; bringing vexatious and frivolous suits, many of them for persons utterly insolvent; purchasing a lot at a trustee's sale of an insolvent's estate under unfair circumstances; making fictitious claims and bringing suits with a view to extort money; and taking a bill of sale from one about to be distrained for rent to prevent such distress. These charges having been sustained, the attorney was rightly suspended from practice for one year.

In *Re John Percy*, 36 N. Y. 651, there were several charges against the attorney, such as that his general reputation was bad; that he had been several times indicted for perjury, one or more of which indictments were pending; that he was a common mover and maintainer of suits on slight and frivolous pretexts; and that his personal and professional reputation had been otherwise impeached in a trial at the circuit. But the court appears to have based its action upon the character of the attorney as a vexatious mover of suits on frivolous grounds. " He was crowding the calendar," said the court, " with vast numbers of libel suits in his own favor, and in the habit of indicating additional libel suits upon the answers to those previously brought by him. In one instance, at least, he had sued his client in a justice's court, and when beaten upon trial, instead of appealing from the judgment he commenced numerous other suits against him in different forms for the same cause, when he must have known that the demand was barred by the first judgment rendered. The only inquiry is whether, in such a case, the court has the power to protect the public by preventing such persons from practising as attorneys and counsellors

in the courts of the State, and by that means harass its citizens." And the court held that it had the power under a special statute of the State authorizing the removal or suspension of attorneys and counsellors, when guilty of any deceit, malpractice, or misdemeanor; and that its power was not limited to cases where such deceit, malpractice, or misdemeanor was practised or committed in the exercise of the profession only, but under the statute extended to cases where there was general bad character or misconduct.

None of these cases, as is manifest from the statement I have made, covers that of an indictable offence, wholly distinct from the attorney's professional conduct. None of them countenances the extraordinary authority of the courts over attorneys and counsellors asserted by my brethren. And, indeed, if the law be that a Circuit Court of the United States, upon whisperings in the ear of one of its judges on the streets, or upon information derived from rumor, or in some other irregular way, that an attorney has committed a public offence, having no relation to the discharge of his professional duties, can summon him to answer for the offence in advance of trial or conviction and summarily punish him, it is time the law was changed by statute. Such a power cannot be safely intrusted to any tribunal. It might be exercised under the excitement of passion and prejudice, as the records of courts abundantly show. Its maintenance would tend to repress all independence on the part of the bar. Men of high honor would hesitate to join a profession in which their conduct might be subjected to investigation, censure, and punishment from imputations and charges thus secretly made.

Seeing that this must be the inevitable result of such an unlimited power of the court over its attorneys, my brethren are careful to express the opinion that it should seldom be exercised, when the offence charged against the attorney is indictable, until after trial and conviction, unless its commission is admitted.

But the possession of the power being conceded, and its exercise being discretionary, there is in the hands of an unscrupulous, vindictive, or passionate judge, means of oppression and cruelty which should not be allowed in any free government.

To disbar an attorney is to inflict upon him a punishment of the severest character. He is admitted to the bar only after years of study. The profession may be to him the source of great emolument. If possessed of fair learning and ability, he may reasonably expect to receive from his practice an income of several thousand dollars a year, — equal to that derived from a capital of one or more hundred thousand dollars. To disbar him having such a practice is equivalent to depriving him of this capital. It would often entail poverty upon himself, and destitution upon his family. Surely the tremendous power of inflicting such a punishment should never be permitted to be exercised unless absolutely necessary to protect the court and the public from one shown by the clearest legal proof to be unfit to be a member of an honorable profession.

To disbar an attorney for an indictable offence not connected with his professional conduct, before trial and conviction, is also to inflict an additional wrong upon him. It is to give the moral weight of the court's judgment against him upon the trial on an indictment for that offence.

I am of opinion, therefore, that the prayer of the petitioner should be granted, and a peremptory *mandamus* directed to the Circuit Court to vacate the order of expulsion and restore him to the bar. The writ is the appropriate remedy in a case where the court below, in disbarring an attorney, has exceeded its jurisdiction. *Ex parte Bradley*, 7 Wall. 364; *Ex parte Robinson*, 19 id. 505.