In re SPICER.

No. 8820.

Circuit Court of Appeals, Sixth Circuit.

March 6, 1942.

Cleon K. Calvert, of Pineville, Ky. (John B. Carter, of Harlan, Ky., on the brief), for appellant.

John T. Metcalf, of Lexington, Ky. (Wendell Berge and Melva M. Graney, both of Washington, D.C., on the brief), for the United States.

Before HICKS, ALLEN, and McALLISTER, Circuit Judges.

HICKS, Circuit Judge.

The District Court made an order directing appellant to appear and show cause why his name should not be stricken from its roll of attorneys for improper and unprofessional conduct in connection with the trial of the case of United States v. Mary Helen Coal Corporation et al.

Appellant denied any improper or unprofessional conduct and prayed that the rule be discharged. Whereupon, the court ordered the District Attorney to take charge of the prosecution and present evidence on behalf of the United States.

Following an extensive hearing, the court ordered and adjudged, (1) that the testimony satisfactorily established that while the trial of the case of United States v. Mary Helen Coal Corporation, et al., was in progress, appellant, who represented one or more of the defendants therein, did knowingly and wilfully endeavor to induce E. L. Greene, Lela Bartley, Easter Farley, James Lankford and John Barnes to give false testimony therein before the court, and did knowingly and wilfully induce Albert Hoskins, Keller Skidmore and Charles Wright to falsely testify in that trial; and (2) that by reason of his conduct appellant was guilty of such wrongful and unprofessional conduct as showed him to be unfit and unworthy to practice as an attorney of the court.

The court thereupon ordered and adjudged " * * * that the name of respondent, C. B. Spicer, be * * * stricken from the Roll of Attorneys of the court and his right to practice and to exercise any of the privileges or function of an attorney * * * at the bar of this, the United States District Court for the Eastern District of Kentucky, be and is hereby revoked." The appeal is from this judgment. Appellant contends that there is no substantial evidence to support it.

We mention very briefly the rules by which a court must be guided in a procedure for disbarment of one of its attorneys.

In Ex parte Wall, 107 U.S. 265, 288, 2 S.Ct. 569, 27 L.Ed. 552, it was said that a disbarment proceeding is one, not for the purpose of punishment, but for the purpose of preserving the courts of justice from the official ministrations of persons unfit to practice in them. See, also, Bradley v. Fisher, 13 Wall. 335, 20 L.Ed. 646; Ex parte Robinson, 86 U.S. 505, 19 Wall. 505, 22 L.Ed. 205; Hertz v. United States, 8 Cir., 18 F.2d 52, 54. It is a power that resides in all courts which have the power to admit attorneys, but it should not be exercised except in clear cases of misconduct. Ex parte Wall, supra. It is one involving the exercise of sound discretion by the trial court. Ex parte Secombe, 19 How. 9, 15 L.Ed. 565; In re Ulmer, D.C., 208 F. 461, 467; Duke v. Committee on Grievances, etc., 65 App.D.C. 284, 82 F.2d 890, 894; In re Schachne, 2 Cir., 87 F.2d 887, 888.

No duty is ever imposed upon a court more delicate than an inquiry into the conduct of counsel. Davis v. Chattanooga Union R. Co., C.C., 65 F. 359, 360. Our power of review is limited to the determination, whether there was an abuse of discretion or grave irregularity. Ex parte Burr, 9 Wheat. 529, 6 L.Ed. 152; In re Schachne, supra; In re Claiborne, 1 Cir., 119 F.2d 647, 657.

No irregularity is asserted. The sole contention made by appellant is "that there is no competent or believable testimony which shows appellant guilty of conduct unbecoming an attorney at the bar of said court." We cannot of course weigh the testimony, but we should examine it for the purpose of determining whether it was so incredible that it was an abuse of discretion for the District Court to rely upon it.

In the case of United States v. Mary Helen Coal Corporation et al., in which appellant's acts of solicitation to give false testimony allegedly occurred, some sixty corporations and individuals were charged with conspiracy to violate Section 7 of the National Labor Relations Act, 29 U.S.C.A. § 159. One of the overt acts charged in the indictment was, that a young man by the name of Bennett Musick, son of a Union organizer, was shot and killed in his home on February 9, 1937, and that the defendants were in some way responsible therefor.

Appellant was attorney for one Hugh Taylor, a defendant in the conspiracy case. The trial was held in London, Ky., and as

part of the division of labor among attorneys for the defense, appellant, whose office was in Harlan, some 84 miles from London, returned to Harlan to assist in undertaking to get information from witnesses with reference to the Musick Killing, which took place only a few miles from Harlan. Appellant conceded under questioning by the court that the testimony of such witnesses was pertinent to the defense in so far as it tended to show that a man by the name of Youngblood and his associates, themselves Union organizers, were responsible for the Musick killing.

The practice in securing information and witnesses appears to have been somewhat as follows: After appellant had interviewed possible witnesses, he reduced their statements to writing, which were signed and in some cases sworn to. These statements were then sent to the attorneys in active charge of the trial and these attorneys, after examining the statements, determined which, if any, of the persons making them, should be called as witnesses. Appellant admitted that he questioned some 200 persons, and took probably 100 statements in connection with the case.

The first witness against appellant was E. L. Greene, who lived at Evarts in Harlan County, some 9 miles from Harlan, and in the neighborhood of the Musick home. He testified that he was standing in front of the Courthouse in Harlan when one Dan Cawood told him that appellant wanted to see him; that he went to appellant's office and was told by appellant that he had heard that he (Greene) knew of a statement made by one "Tick" Arnett with reference to the Musick killing; that he replied that he did not know Arnett, to which appellant answered, "You told me that you was in hard luck * * * I can make it interesting for you. I can get you a lot of money." Greene then replied, "I need the money but I don't know Mr. Arnett and hit would be best for me not to tell something that I didn't know." To which he testified that appellant answered, "Mr. Greene, I hate to give you up * * * you'd make an awful impression before the jury."

Greene's daughters, Easter Farley and Lela Bartley, were witnesses against appellant. Mrs. Farley testified that she lived at Black Mountain, and that Dan Cawood came and said that he wanted her and her sister, who lived about 3 miles away at Evarts; that they picked her up and drove down to appellant's office, where appellant told them "we have got to say that it was the other side done the shooting in the Musick home. * * * Like me and Lela would be coming down the street and overhear Mr. Arnett and some other fellows talking. Mr. Arnett said 'it was too bad about the Musick boy getting killed' and that the other fellow said, 'yes it was' and that Mr. Arnett then said, 'well, we thought they were all going to be away from home that night'."

She testified further that appellant said, "We have got to show that. * * * We are making arrangements to take a carload of witnesses down there * * * "; that he asked if $25.00 would be enough; that he "worded" off a statement to a stenographer and asked them to sign it and they did so. She testified that actually she did not know Arnett; that she signed the statement to get out of there; that she took a copy of the statement to her father; but that she never received $25.00.

Mrs. Bartley's testimony as to the visit to appellant's office was substantially the same as that of her sister, Easter Farley. She said that she swore to the statement presented by appellant's stenographer but that she did not read it. On cross-examination she testified that she got a copy of the statement to take to her husband, who was a Union man; that she "just took it home and seen it was false and I wasn't going to testify to no story" that she knew was false, but that she was scared and was in a hurry to get back to her baby.

Neither of these witnesses testified in the criminal case for conspiracy. Although it is not material here, apparently when Greene read the statement he asked Government agents to look into the matter. Appellant admitted that these people were in his office, but asserted that Greene came in voluntarily and asked to be made a witness. He denied that he sent for Mrs. Farley or Mrs. Bartley, but admitted taking a statement from them. Both he and his stenographer denied that words were put into their mouths and appellant denied that money was offered to any of the three.

The next witness against appellant was Jim Lankford who lived in Evarts. He testified that Dan Cawood came to get him and take him to appellant's office where appellant stated that he was informed that he (Lankford) knew something about the killing, referring to Youngblood, and said that he would like to make him a witness.

Lankford testified that he knew nothing about it at all and left, but that later appellant drove to his house and asked to be taken to the Musick home and that while they were in the car together he was asked if he had changed his mind and if he could help them. To this Lankford replied that he could not, that he didn't know Youngblood.

Appellant testified that Lankford told him that he had seen Youngblood and a boy by the name of Smith get out of a car at Stark's hotel on the night of the murder, but on cross-examination appellant admitted that he had not subpoenaed Lankford, claiming that Lankford was afraid he would lose his job with the Highway Department if he did. Appellant also offered evidence that Lankford was an ex-convict.

Albert Hoskins, who lived in Evarts, testified that he drove to appellant's office in Murphy Kelley's car along with Vernon Kelley, John Barnes and Everett Fleenor; that they waited in appellant's outer office while Fleenor went in to talk to appellant; that Fleenor came back and "told us what we was supposed to tell in the case of Mr. Youngblood, swearing against Mr. Youngblood and Granville Sargent, and then we went into Mr. Spicer's office and worded the story." Hoskins admitted that he told appellant what he said was the truth, testifying that appellant asked them questions first and then dictated the story to his stenographer; that they did not sign the statement that day but came back and did so the next day, after which he was paid $25.00 by Fleenor in the toilet on the same floor. The statement that they signed was to the effect that they were at Bryan Middleton's saloon and saw Sargent and Youngblood get out of separate cars, go to the saloon and order whiskey, after which they went up the road and came back again in a few minutes in good spirits, remarking that something went off all right. Hoskins testified that he told appellant he didn't know either Sargent or Youngblood but that appellant replied "some of the boys could show him to me down there."

There was more testimony by Hoskins about Barnes dropping out and the substitution of Keller Skidmore; of appellant's fear that Barnes might talk; of how he, Hoskins, went down and told the story to the defense attorneys at Corbin; of how he testified at the conspiracy trial, and that after he had testified, his mother told him that he had done wrong and that he was subpoenaed and went down later and told the straight of it.

John Barnes' testimony was similar to that of Hoskins as to the visits to appellant's office and the preparation and signing of the statement. It differed in that Barnes testified that later he went back to appellant and told him that he was not going to swear a lie, to which appellant said that it was a dirty deal to take their money and not testify. He testified that before they went to appellant's office Fleenor told them that they were going down to swear against Youngblood and Sargent.

Keller Skidmore testified that he went to appellant's office with Murphy Kelley, Vernon Kelley, Hoskins and Fleenor; that they talked about the case, "talked about making a witness down there and I was supposed to take the place of John Barnes who fell out." He testified that he studied a statement signed by Vernon Kelley, Barnes and Hoskins and then went back to appellant's office and made a new statement which was similar except that Barnes' name was omitted; that this statement was signed by Hoskins, Vernon Kelley and Skidmore. He testified that he was invited to go to appellant's office by Vernon Kelley who asked him if he wanted to make some easy money. He admitted that he talked to defense attorneys in Corbin, going over the statement, and that he told them it was true. It is stipulated that attorneys for the defendants in the conspiracy case interviewed Hoskins and Skidmore before putting them on the stand as witnesses and said to them, "This is a serious thing. You are charging a man with murder. Are you telling the truth?" and that they said, "Yes, we are telling the truth." Skidmore testified that he was paid $45.00 by Fleenor, $20.00 after he signed the statement in appellant's office and $25.00 after he testified in London.

Skidmore then testified that after he was a witness in London in the conspiracy case, Dave and Kelley Fox threatened him with prosecution for false swearing and that appellant hearing this, got him and Hoskins to sign another statement, to the effect that the original was true, but he testified that the testimony he gave upon the trial of the conspiracy case touching the supposed connection of Youngblood and Sargent with the killing of Musick was untrue.

Appellant claimed to have no recollection of Barnes and that he did not know Skidmore until the latter came to his office to make his statement. He denied that Fleenor was ever around his office until after the trial. Ila Boling, his stenographer, denied that Fleenor was around when Vernon Kelley, Hoskins and Barnes talked to appellant. She denied that appellant suggested what they should say or that anything was said about money.

Fleenor denied that he took any of these witnesses to appellant's office or that he paid them any money.

Vernon Kelley, who was Fleenor's nephew, denied that Fleenor was ever at appellant's office when he was there. He denied that appellant suggested what he should swear and denied receiving any money himself or having any knowledge that any of the others got any money.

It was brought out in cross-examination that Barnes had been convicted once of making liquor and that Skidmore had since the conspiracy trial been convicted for grand larceny.

Charles Wright testified that on Sunday, the day before he testified in London, he was told to go to appellant's office; that appellant asked him if he worked at Bryan Middleton's saloon; that he replied that he had worked there, to which appellant answered. "You have got to go and swear that you worked in there when the Musick boy was killed." Wright testified that he answered that he did not work there then, to which appellant replied, that he had to say he did anyhow. He testified that he did not want to go; that he was not even permitted to go back home for clean clothes, but was given fresh clothes, and was taken to Corbin, where he was told to remember that Walter Smock bought whiskey from him at Middleton's saloon on the night the Musick boy was killed; that he so testified at the conspiracy trial but that what he testified was not true; that he received $25.00 from George Ward at a hotel in Corbin for testifying.

Appellant denied that he even talked to Wright, and stated that he had nothing whatever to do with him.

The above, except for judicial opinions in a few reported cases which contained language tending to reflect upon appellant's character, embodied the chief testimony against him. A mass of testimony was offered in his defense, which, in view of our limited powers of review, it is needless to recount in detail. It is enough to say that there was testimony which tended to impeach and discredit the evidence of a number of the Government's principal witnesses. Appellant's character was pronounced good by a number of witnesses, including lawyers, doctors, and judges before whom he had practiced. Appellant admitted having taken statements but emphatically denied ever having told any witness or prospective witness what they should say or that money would be given them for their testimony.

 It is difficult to imagine that the witnesses against appellant would have perjured themselves for the Government; certainly it is almost inconceivable that the three who did testify in the conspiracy trial would perjure themselves in this case to reveal that they were guilty of perjury in that case. Whether these witnesses were telling the truth was a matter for the District Judge. As a trier of the facts that official was the sole judge of the weight and credibility to be given to their testimony. The Judge found against appellant as hereinabove indicated and we cannot say that the evidence refuted, negatived or nullified the testimony of the Government's witnesses. It follows that there was no abuse of judicial discretion in the conclusions reached or in the judgment appealed from.

Affirmed.